816 So.2d 349 (2002)
Gleason NUGENT, Johnny Ray Carpenter, Doris Abrams and Shelia White, Plaintiffs-Appellants,
v.
Benji PHELPS, Fox McKeithen, Secretary of State and Suzanne Haik-Terrell, Commissioner of Elections, Defendants-Appellees.
No. 36,366-CA.
Court of Appeal of Louisiana, Second Circuit.
April 23, 2002.
Writ Denied May 10, 2002.
*350 Edward Larvadain, Jr., Belle Rose, Counsel for Plaintiffs-Appellants.
Stephen D. Hawkland, Baton Rouge, Counsel for Defendant-Appellee, Fox McKeithen.
Bobby L. Culpepper, Jonesboro, Martin Smith Sanders, Winnfield, III, Counsel for Defendant-Appellee, Benji Phelps.
Michael Sean Walsh, Juliet E. Thompson Rizzo, Baton Rouge, Counsel for Defendant-Appellee, Suzanne Haik-Terrell.
Before NORRIS, BROWN, STEWART, GASKINS and KOSTELKA, JJ.
*351 NORRIS, Chief Judge.
In this election contest case, the plaintiffs sought to have the April 6, 2002 election for Winnfield Police Chief nullified and a new election held. Plaintiffs asserted numerous irregularities and unlawful activities by defendant, Benji Phelps, and his supporters. However, plaintiffs Johnny Ray Carpenter, Doris Abrams, and Shelia White were dismissed early in the action pursuant to exceptions of no right of action because the court concluded that under La. R.S. 18:1401 B only the losing candidate is a proper plaintiff to challenge the election results. Only plaintiff Gleason Nugent, the incumbent Police Chief who lost the election by a margin of four votes, was held to be a proper plaintiff. This was not challenged on appeal. At the end of Nugent's case, the trial court granted an involuntary dismissal[1] of Nugent's suit, and this appeal followed. For the reasons set forth below, we affirm the trial court's judgment.

FACTS
The following is a summary of the factual allegations of the plaintiffs' petition:
Carpenter, Abrams, and White supported Nugent for Police Chief, and if free on election day, they would have gotten enough votes to get Nugent reelected. On the other hand, Terry Reeves, the District Attorney for Winn Parish, supported Mayor Deano Thornton and Benji Phelps who were working as a team to be elected to the positions of Mayor and Police Chief, respectively.
Reeves, as D.A. rules Winn Parish through "fear and terror." In the past, Shelia White had gotten along with Reeves who, along with Thornton, had got her the job of Executive Director of the Winnfield Housing Authority (WHA). However, Reeves' behavior toward White drastically changed when she refused to write a $100,000 check on WHA funds as a donation to the city in connection with the building of a community center. Subsequently, she was "terrorized" by Assistant District Attorney James Lewis to "break her" so that she would favor the donation.
Reeves, through Lewis, empaneled a grand jury to investigate the way White was operating the WHA. On June 4, 2001 she received a subpoena to produce all her records before a grand jury, but after taking the records to the jury and waiting four hours, she was told she could go home and take the records with her. Reeves sent an investigator to the WHA who investigated the records for more than seven months. White was subpoenaed again on January 29, 2002 to produce documents she already had produced. On February 8, 2002, Reeves' office issued another subpoena ordering document production. White also produced these documents, but still would not write the $100,000 check.
As election day was approaching, Reeves had Lewis issue subpoenas to the plaintiffs, ordering them to appear before a grand jury during the week of the election, thus preventing them from campaigning. The cases against the plaintiffs were presented on April 3, 2002, and all plaintiffs were indicted except Gleason Nugent.
On April 4, 2002, Judge James Wiley signed arrest warrants for the indicted plaintiffs. Wiley was a former Assistant District Attorney under Reeves. All the arrests were made on the evening of *352 April 4, 2002, except one which occurred the next morning. Thus plaintiffs were arrested on April 4, 2002, spent that night in jail and thought bond would be set the next day, but at a hearing on the morning of April 5, 2002, the court told the plaintiffs that the state had requested a bail hearing. The plaintiffs believed this was done to keep them in jail so that Reeves' candidates could be elected with "minimum opposition."
Judge Wiley refused to set bail without a hearing and would not set a hearing prior to the election. When the plaintiffs asked the court's permission to vote on election day, the judge told them it was up to the sheriff to transport them to the polls. However, Carpenter later learned that Judge Wiley and Reeves knew that the plaintiffs would not be able to vote.
At the election on April 6, 2002, Phelps received 911 votes, while Nugent received 907. The plaintiffs would have voted for Nugent, and would have gotten "many many other votes" for Nugent. But for "substantial irregularities, error, fraud, or other unlawful activity in the conduct of the election," Nugent would have been reelected.
Some of the substantial irregularities and unlawful activities conducted by Terry Reeves and his allies included vote buying. On March 22, 2002, Phelps bought votes by giving James Womack $100 on an open account at the Winni-Mart, telling Womack that persons using the code word "Lip" would be able to purchase $5.00 worth of items. Lip is the alias of Robert Hall, Jr. who paid seven individuals with liquor and cigarettes to vote for Phelps. These individuals otherwise would have voted for Gleason.
During the period for voting absentee, Thornton and Phelps paid four individuals to vote for them. These individuals were given a ballot marked with Thornton and Phelps' numbers, two and four, and were told that after they voted those numbers they would be taken to the Corner Store or Winni-Mart to purchase up to $6.00 in merchandise. The majority of these four would have voted for Nugent if their votes had not been bought. Thornton and Phelps committed these acts because they knew Reeves would not enforce the law against them, and knew that Reeves would enforce the law against their opponents.
On April 11, 2002, Judge Wiley recused himself and was replaced by a retired judge appointed by order of the Louisiana Supreme Court. Before the first witness testified, the court noted that there was an ongoing investigation by the Commissioner of Elections into alleged vote buying. The court was requested to read and did read the provisions of La. R.S. 18:1461 concerning vote buying. The court also read the provisions of La. R.S. 14:119 concerning bribery of voters, including that portion of the statute stating that in the trial of a person charged with bribery of voters, either the bribe-giver or the bribe-taker may give evidence or make an affidavit against the other, with immunity from the prosecution in favor of the first informer, except for perjury in giving such testimony.
The first witness to testify was Benji Phelps. He admitted to setting up an account at Winni-Mart with Mr. James Womack in the amount of $100. He stated that the purpose of the account was to provide people who were helping him with "something to eat and drink." He denied using any code word in order to use the account, and he indicated that something to eat did not include beer or cigarettes. Phelps admitted knowing Lip and identified him as Robert Hall, Jr., but *353 denied paying Lip to haul people to the polls, and denied telling him that he had money at Winni-Mart to pay people that Lip was able to get to vote for Phelps. Phelps also denied giving Lip a blue paper with the numbers two and four on it.
The next witness was James Womack, who worked at Winni-Mart. He admitted talking with plaintiff about the account and telling him how it was set up. However, other than plaintiff, Womack stated he had only talked to Phelps who "just mainly asked me what Mr. Nugent asked." According to Womack, the account was set up sometime in March in the amount of $100, and Phelps told Womack "there would be some people coming in and charging on it." Womack stated that people did come in and charge on the account, charging cold drinks, candy, beer and cigarettes. No code word was used; instead, those charging on the account simply asked for their purchases to be put on "Benji's account."
Plaintiff's counsel asked Womack if he kept a running tab on the account, and Womack responded in the affirmative. He also admitted that he had the running tab with him. When plaintiff's counsel asked to see it, Phelps' counsel objected; plaintiff's counsel's stated: "I'm not going to question on this. I am going to question on the petition."
Womack stated that the entire $100 was not used, but some five to ten people made charges on the account. There was a $5.00 limit on purchases by any one person.
When Womack was questioned by Phelps' counsel, he indicated that Phelps had told him there might be "some workers in the area" and that he should let them charge. In response to a question by counsel for the Commissioner of Elections, Womack indicated that a list of purchases was prepared, but he did not give a copy of the list to Mr. Nugent. However, when asked if he gave a copy of the list to anybody, he responded "they received a copy of it." Apparently, Womack was referring to certain individuals in the courtroom, and when counsel asked to see a copy of the list, someone provided a list. However, the list was not entered into evidence.
On reexamination by plaintiff's counsel, no attempt was made to enter a copy of the list into evidence even though it was apparent that a copy was present in the courtroom. Counsel did ask Womack if he had the list with him, but Womack responded in the negative, although indicating that "he," a person unidentified in the transcript, got a copy of it. At the conclusion of Womack's testimony, he was released from his subpoena and allowed to leave the courthouse.
The next witness called was Robert Hall, Jr., a.k.a. "Lip." However, Hall chose not to testify, invoking his right against self-incrimination.
Walter Glynn testified next, stating that during absentee voting, Lip picked him up and took him to vote absentee. Later, Lip took him to the Corner Store where he bought Glynn a beer and a pack of cigarettes. According to Glynn, Lip had given him a piece of paper with the numbers two and four on it, the numbers for Chief of Police and Mayor. However, Glynn indicated he did not ask for the beer and cigarettes, and that the way he voted had nothing to do with the beer and cigarettes. Instead, he voted for whom he wished to vote.
Michael McDonald testified next, stating that he voted absentee and ran into Lip at the courthouse where he went to vote. After McDonald voted, Lip took him to the Winni-Mart where each got a "40 ounce Magnum" to drink. Lip allegedly told the *354 clerk to put it on "Benji's account." Lip told McDonald that Benji had given him $100 to go and get people to vote for him, but McDonald indicated that he did not sell his vote for a beer; instead, he voted for whom he wished to vote.
The next witness, Gwendolyn Amos, testified that she was taken to the polls by a James Wilson. Objection to her testimony was made because there was nothing in the pleadings about a James Wilson. Ultimately, counsel for Nugent made a proffer of Amos' testimony. Amos candidly admitted selling her vote for two packs of cigarettes and stated that she had planned to vote for Mr. Nugent. Her vote for Phelps was made absentee.
The next witness was Theotis Duncan. Mr. Duncan's testimony also was made in the form of a proffer because he was not listed in the petition. He testified to being given $40 on two occasions to haul people to the polls. However, he denied buying anyone cigarettes or beer. According to Duncan, the money was given to him by a John Scott who Duncan initially indicated worked in the District Attorney's office, but subsequently indicated did not work in that office, but "in the same building."
A third proffer was made with respect to the testimony of Lashonda Darby. Darby was taken to vote absentee by James Wilson at the same time as Gwendolyn Amos. She testified that she had never voted before, and Wilson told her he would show her how to vote. Wilson gave her a paper with the numbers two and four on it, and "halfway" he told her he would buy her "anything I wanted." After she had voted these numbers she was taken to the Corner Store by Wilson who bought her a pack of cigarettes and two beers. However, her testimony indicates that rather than voting for two and four in order to receive beers or cigarettes, she simply voted for two and four because she thought that was the way she was supposed to vote.
Teresa Morris testified next. She is the sister of dismissed plaintiff Johnny Ray Carpenter. She testified to voting absentee, and to being taken to vote by Lip. She stated she was given a paper for the Mayor and Phelps, and that Lip promised her $5.00. However, she stated that she did not vote the two numbers she was given.
The next witness, Freddie Lee Jackson, also testified to being taken by Lip to vote. However, he indicated that Lip did not promise him anything, but bought him "a drink" after he voted. Although Lip gave him a card with the numbers two and four on it, he voted one and three.
Dycie Moore was the next witness. She is the wife of Uvonne Moore, also known as Slug. Like the witnesses before her, she testified to voting absentee and to being picked up by Lip who took her to the courthouse to vote. Afterwards, he bought her a cigar and a can of beer. Although Lip gave a paper with the numbers two and four on it, she voted one and four. When specifically questioned, she stated that she voted number four that day because she wanted to and would still vote that way. Likewise, she voted for number one on her own.
Plaintiff Johnny Ray Carpenter testified next. At this point, the testimony shifted from vote buying to the activities surrounding the plaintiffs' grand jury indictments and subsequent arrests. Essentially, Carpenter testified that in the week before the election he was occupied with being called before the grand jury and was unable to get out and campaign. He stated that he would have been able to get between two and three hundred votes for Nugent if he had not had to be at the grand jury. He was indicted by the grand jury on 103 counts, and was arrested on a *355 Thursday night. He was unsuccessful in trying to get the judge to set bond, so he spent the night in jail along with Doris Abrams and Shelia White. The next morning he learned that the D.A. had filed a motion "to deny bond." Bond was not set until the Monday after the election, keeping Carpenter from voting. Carpenter testified he would have voted for Nugent and would have campaigned for Nugent.
Winn Parish District Attorney Terry Reeves was next to testify. He stated that the grand jury that indicted the dismissed plaintiffs in 2002 had been impaneled in 2001 to investigate the WHA. Reeves denied as "absolutely, totally untrue" and "a specious lie" that he manipulated this grand jury to prevent the dismissed plaintiffs from getting out and politicking for plaintiff. He also denied telling Assistant District Attorney Lewis to file a motion to keep the plaintiffs in jail over the weekend. Reeves testified that he was aware that a bond motion was filed,[2] but he did not file it. The bond motion was filed by Lewis, and Reeves could not remember if he had discussed it with Lewis before the motion was filed.
Next to testify was Shelia White. She indicated that she was indicted by the grand jury and was not allowed to vote on election day. The trial court did not allow her to testify concerning the alleged $100,000 check mentioned in the petition. She stated that her appearance before the grand jury prevented her from campaigning for her candidate, Chief Nugent, and that after being arrested she, like Carpenter, spent Thursday night in jail. On Friday morning, she learned that there must be a bond hearing before she could post bond. She was released from jail on Monday afternoon. She indicated that she had been indicted for three counts of theft, malfeasance in office, and injuring public records.
Doris Abrams testified next. Her testimony was very much like that of Carpenter and Whitehad she not been in jail, she would have politicked and voted for Nugent. She was indicted on 18 counts including theft, injuring public records, and fraud.
Before the last witness testified, counsel for plaintiff indicated that he had been told that Lip wanted to testify. The court noted that he initially had invoked his Fifth Amendment right not to testify, but now wished to recant. The court concluded that Lip obviously had talked to someone, and denied his request to testify. No proffer was attempted with respect to his testimony and no error was assigned to this ruling.
The last trial witness was the plaintiff, Gleason Nugent. He stated that "during the election," he was told of vote buying, that he investigated the allegations, and that he contacted the state about election fraud. He indicated that he went to the Winni-Mart where he talked to James Womack and discovered that an account had been set up. He recovered $100 from Mr. Womack and asked to see the account set up at the store. Womack allegedly showed him an account. Plaintiff identified a document as the account, but said Womack never gave him a copy; he received the copy only "this morning." An objection then was made to the document because it was not entered into evidence through Mr. Womack who had testified previously. The court ruled that the document purported to be a business record of the Winni-Mart and would be properly identified by the custodian of the Winni-Mart *356 records. The document was not identified when Mr. Womack was on the stand, and the court ruled that plaintiff could not identify business records that were not his own, whether they were shown to him or not. Plaintiff's counsel then made a proffer of the alleged copy of the list, with plaintiff indicating that the document had the word "Lip" on it. Plaintiff also testified that what caught his attention on the document was a notation, "five votersa case of Bud."
With respect to the grand jury proceedings, plaintiff testified that he appeared before the grand jury from Monday through Thursday of the week preceding the election, and that his appearance there interfered with his ability to campaign. He felt this was done intentionally. On cross-examination denied that he had contested absentee votes. At the conclusion of cross-examination, plaintiff rested his case.
Immediately thereafter, a motion was made for involuntary dismissal, and after hearing the argument of the attorneys and reviewing the evidence briefly, the court stated that the burden was upon the plaintiff to establish that irregularities occurred that would have made a difference in the election. The court noted there was no challenge to any of the absentee voting as set out in the election code, so the court was left with the allegation that the three dismissed plaintiffs were not allowed to vote due to the alleged scheme by the District Attorney which would include Judge Wiley and the grand jury proceedings. The court found that the plaintiff had not met its burden of proof as to that alleged scheme. Accordingly, the court granted the motion to dismiss.

ASSIGNMENTS OF ERROR
Appellant has raised the following assignments of error:
(1) The trial judge erred when he failed to find that the number of persons, who were bribed for their votes by a worker for Benji Phelps was sufficient to change the outcome of the election, as required by the holding of Savage v. Edwards, [98-1762 (La. App. 3 Cir. 11/23/98), 728 So.2d 428, affirmed, 98-2929 (La.12/18/98), 722 So.2d 1004], and therefore, the election should have been declared null and void.
(2) The trial judge erred and committed reversible error when he informed potential witnesses that their testimony could be used against them and that they could be convicted of violating La. R.S. 14:119, bribery of votes [sic], without telling them that they could be given immunity from prosecution if they came forth with truthful testimony.
(3) The trial judge erred when he failed to find that the votes of Johnny Ray Carpenter, Shelia White and Doris Abrams, ardent supporters of appellant, Gleason Nugent, should have been counted because they were intentionally incarcerated for the sole purpose of keeping them from campaigning and voting in the April 6, 2002 election for chief of police.
(4) That the trial judge failed to find that District Attorney Terry Reeves, a strong supporter of Benji Phelps, abused the powers of his office when he subpoenaed appellant, Gleason Nugent, to appear before the trial jury a week leading up to the election.

DISCUSSION
Before discussing appellants' assignments of error, we note that appellee, Benji Phelps, filed a motion to dismiss this appeal, arguing that the appeal was untimely. *357 However, at oral argument appellee abandoned his motion.[3]
Turning now to the appellant's assignment of errors, we note that his first assignment argues that the trial court erred in failing to find that the number of persons who were bribed for their votes by a worker for Phelps was sufficient to change the outcome of the election. In this regard, appellant asserts that the testimony revealed at least seven witnesses were bribed for their votes by Lip, and that all seven votes should be subtracted from Phelps' total regardless of whether the witnesses who received the bribes actually voted the way Lip requested them to vote. Thus, the result would be different. Appellant also argues that the court should have admitted into evidence the document allegedly from Winni-Mart showing two purchases with a notation "Lip," as well as the notation, "five votersa case of Bud." We must disagree with appellant's arguments on this assignment of error.
Under La. R.S. 18:1432 A, if the trial judge in an action contesting an election determines that (1) it is impossible to determine the result of the election, or (2) the number of qualified voters who were denied the right to vote by election officials was sufficient to change the result if they had been allowed to vote, or (3) the number of unqualified voters who were allowed to vote by election officials was sufficient to change the result if they had not been allowed to vote, or (4) a combination of the factors referred to in (2) and (3) would have been sufficient to change the result had they not occurred, the judge may render a final judgment declaring the election void and ordering a new primary or general election for all the candidates. Considering this language, the Louisiana Supreme Court in Adkins v. Huckabay, 99-3605 (La.2/25/2000), 755 So.2d 206, stated that a party contesting an election no longer must show that "but for" the irregularity he would have won the election.
Although a party contesting an election is no longer limited to the "but for" standard, we note that a party contesting an election still must show at least that because of fraud or irregularities, the outcome of the election is impossible to determine. Thus, it is the effect of the irregularity on determining the outcome, rather than the fact of an irregularity by itself, that guides us in these matters. Accordingly, we conclude that a vote should not be cast out simply because a voter was offered a bribe, or even because a voter accepted something of value for the vote, provided that voter still voted the way he originally intended. Regardless of criminal implications, our focus is on whether the alleged activities actually changed the result of the election by changing the vote totals, or at least made the election result impossible to determine. Based on this record, no more than two votes would be subtracted, a difference that would be insufficient to change the election result or make it impossible to determine.
We also agree that the trial court did not err in excluding proffered copy of the list from Winni-Mart. Although appellant's counsel states in brief that he did not see the document until Womack had testified and was released by the court, it is plain that appellant, as the result of his investigation, was aware of its existence even before the case was tried, and it was plainly present in court when Womack *358 testified. However, no attempt was made to introduce the list into evidence at that time. Womack, or some other Winni-Mart employee, would have been a proper person to identify the document. Appellant did not make the list, did not keep records for Winni-Mart, and could not say who made the list or the circumstances under which it was made.
We also observe that Louisiana's hearsay exception found in La. C.E. art. 803(6) is based substantially on Federal Rule of Evidence 803(6). The federal Fifth Circuit has stated that the primary emphasis of FRE 803(6)'s hearsay exception for business records relates to the trustworthiness of the records, and that the trial court has great latitude in resolving the issue of trustworthiness. United States v. Parsee, 178 F.3d 374 (C.A.5 1999). Likewise, the Official Comments to the Introductory Clause to La. C.E. Art. 803 state that the exceptions to the hearsay rule listed in the Article are based on the general conclusion that when the qualifying circumstances are met there ordinarily is a sufficient basis for crediting the trustworthiness of the out-of-court statement, and, generally, there must be sufficient indication from the circumstances that the declarant has firsthand knowledge of that of which he spoke. Part of the "qualifying circumstances" for the business records exception is the firsthand knowledge requirement of Article 602 which prevents a witness from testifying to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. In the instant case, we do not know who made the entries on the document from Winni-Mart, although presumably they were made by an employee or employees other than Womack. While there might be a sufficient basis for crediting the trustworthiness of the entries as to items purchased, there appears to be no sufficient basis for crediting the trustworthiness of the portion of the entry indicating "five voters." That is because we do not know enough about the circumstances to conclude that the unknown declarant had firsthand knowledge that the unknown parties were voters, or that the beer was being purchased by or for "five voters."
In his second assignment of error, appellant notes that the trial judge informed all the potential witnesses that their testimony could be used against them and that they could be convicted of violating La. R.S. 14:119. Appellant asserts that the trial judge erred by not telling these witnesses that they could be given immunity from prosecution if they came forth first with truthful testimony. However, a review of the transcript will show that the judge read to the potential witnesses that portion of the statute dealing with immunity. There was no requirement that the judge explain or rephrase the statute, and appellant's counsel failed to request any special instructions or object to the statute as read. This assignment of error has no merit.
Appellant's third assignment of error concerns the grand jury proceedings and the subsequent arrests of Carpenter, Abrams and White, resulting in the three being in jail when the election took place. Appellant argues that these three votes should have been counted in the election and added to plaintiffs total.
We find no merit in this argument. The arrests of Carpenter, White, and Abrams were the result of grand jury indictments, not arrests ordered by the district attorney. Furthermore, the trial court's remarks at the end of the trial indicate that the judge simply did not believe that the plaintiff had met its burden of proving a scheme by the District Attorney that would have included the district judge and *359 the grand jury. Certainly, the District Attorney vehemently denied any such scheme when he testified. A court of appeal may not set aside a finding of fact by a trial court in the absence of manifest error or unless it is clearly wrong, and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Huckaby v. Hunter, 427 So.2d 1 (La.App. 2 Cir.), writ denied, 427 So.2d 1197 (1983). We find no manifest error on the part of the trial court.
In his final assignment of error, appellant asserts that the trial court erred in failing to find that the District Attorney abused his powers when he subpoenaed appellant to appear before a grand jury in the week leading up to the election. As stated above with respect to assignment of error number three, the trial court held that appellant failed to carry his burden of proving a scheme by the District Attorney involving the grand jury. We find no manifest error. Accordingly, we reject appellant's assignment of error.

CONCLUSION
Although we ultimately conclude that there is no manifest error in the trial court's finding that plaintiff failed to carry his burden of proof to annul the election, this does not mean we find no evidence suggesting irregularities and/or fraud in this election. We also observe that the trial court was overly strict in refusing to consider the testimony concerning vote buying and in other evidentiary rulings. It is most curious that the Commissioner of Elections, who is currently investigating charges of fraud and vote-buying in this election, often objected to evidence that was relevant to these charges. However, because some of this evidence was proffered, and rulings on admissibility have not been assigned as error, there is no ground for reversal. We also are cognizant of the difficulties of either proving or defending against allegations in an election contest in which time periods necessarily are short. However, there are other remedies for election offenses. See La. R.S. 18:1461 et seq.
For the reasons set forth above, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] The dismissal was erroneously referred to as a "directed verdict," but the matter was not tried by jury.
[2] While the testimony does not specify the nature of the bond hearing, the plaintiffs' petition alleges it was a C.Cr.P. art. 330.1 hearing.
[3] The motion was based on the requirement that an appeal under La. R.S. 14:1409 D must be taken within 24 hours of rendition of judgment. However, under the statute rendition means signing by the judge, and in this case the appeal was taken within 24 hours of signing.