862 So.2d 331 (2003)
HIBERNIA NATIONAL BANK, Plaintiff,
v.
Alfred J. ANTONINI and Alva Jane Marquez Antonini, Defendants-Appellants.
No. 37,836-CA.
Court of Appeal of Louisiana, Second Circuit.
December 10, 2003.
*332 Mayer, Smith & Roberts, L.L.P., by David F. Butterfield, Shreveport, for Appellants.
Guerriero & Guerriero, by Joe D. Guerriero, Monroe, for Appellees, Northeast Realty, L.L.C. and North American Land Development Corp.
Before BROWN, PEATROSS & DREW, JJ.
*333 PEATROSS, J.
On April 21, 1997, Hibernia National Bank ("Hibernia") filed suit against Alfred J. Antonini and Alva Jane Marquez Antonini to collect on a note and to recognize and enforce a collateral mortgage on Cypress Manor Apartment Complex ("Cypress Manor") in Monroe, Louisiana. Summary judgment was rendered by the trial court in favor of Hibernia, but this court later vacated that judgment and remanded the matter back to the trial court. See Hibernia National Bank v. Antonini, 33,436 (La.App.2d Cir.8/23/00), 767 So.2d 143. Northeast Realty, L.L.C. ("Northeast") purchased the note and collateral mortgage from Hibernia and was substituted as plaintiff. On remand, the trial court ultimately entered judgment in favor of Northeast in the amount of $544,958.38, with annual interest of 11 percent from May 23, 1996, but subject to a credit on January 11, 1999, of $87,125.16. This appeal ensued. For the reasons stated herein, we amend the judgment of the trial court and, as amended, affirm.

FACTS
This court's prior opinion in this case sets out the factual background of this matter. See Hibernia National Bank v. Antonini, supra. Briefly stated, to facilitate their purchase of Cypress Manor, the Antoninis executed a promissory note payable to Hibernia in the principal amount of $650,000 with annual interest of 11 percent. The note matured on May 23, 1996, and became due and payable. The promissory note was secured by a collateral mortgage note executed by the Antoninis in the principal amount of $975,000, with interest of 12 percent and a collateral mortgage on Cypress Manor. Judah Hertz, from whom the Antoninis purchased Cypress Manor, executed a commercial guarantee of the Antoninis' indebtedness to Hibernia. When Hibernia filed suit to collect the note and make the collateral mortgage executory, the balance on the note was $544,958.38. As previously stated, the trial court initially granted summary judgment in this case in favor of Hibernia, recognizing the collateral mortgage and making it executory. Northeast was then substituted as plaintiff. In a prior appeal, this court reversed the granting of summary judgment in favor of Hibernia and remanded the matter. Subsequently, Northeast filed a motion for summary judgment, which was denied by the trial court, and the matter was tried on July 10, 2002. In the meantime, Mr. Hertz settled with Northeast for the undisputed amount of $60,000.
After trial, the court ruled in favor of Northeast and against the Antoninis, awarding Northeast $544,958.38 with 11 percent interest from May 26, 1996, subject to a credit of $87,125.16, which was applied to the interest accrued as of that date. The trial court also awarded Northeast attorney fees and costs and recognized the collateral mortgage, making it executory. This appeal ensued.

DISCUSSION
The Antoninis raise the following four assignments of error on appeal:
1. Whether the trial court erred in finding that the note was not extinguished by fraudulent inducement.
2. Whether the trial court erred in finding that the note was not extinguished by detrimental reliance.
3. Whether the trial court erred in failing to extinguish the note by confusion, and in not allowing the Antoninis to conduct discovery for their confusion defense.
4. Whether the trial court erred in failing to give the Antoninis credit for the Hertz settlement.
*334 Assignments of error numbers 1 & 2: Fraudulent inducement and detrimental reliance
First, the Antoninis argue that the note should be extinguished because Hibernia fraudulently induced them to sign it. According to the Antoninis, Hibernia actively marketed Cypress Manor to them because Mr. Hertz was having problems paying the loan. Recall that Mr. Hertz was the prior owner of Cypress Manor and his financing was with Hibernia. Mr. Hertz's note was put on the "watch list" and the Antoninis argue that Hibernia was trying to secure a purchaser for the property in an effort to turn Mr. Hertz's non-performing loan into a performing one. The Antoninis submit that Mary Kay Weeks, a loan officer with Hibernia at the time they purchased the apartment complex, supplied Mr. Antonini with an operating statement of Cypress Manor that incorrectly portrayed it as very profitable. In addition, they argue that Ms. Weeks gave Mr. Antonini a copy of a confidential appraisal of the property which showed an inflated and inaccurate potential future profitability. Despite the testimony of Paul Thompson, a vice president of Hibernia, that such activities were not the practice of Hibernia, Mr. Antonini strongly argues that Hibernia tried very hard to get him to purchase the property to protect its investment. The Antoninis contend that these alleged marketing efforts are special circumstances which gave rise to a duty of care on Hibernia's part and that this duty was breached by Hibernia's furnishing of misleading and false information regarding the profitability of the apartment complex.
The Antoninis also argue that they would not have purchased the property but for Hibernia's alleged unfulfilled promise to provide permanent financing for the venture. In support, they submit that, once Mr. Antonini applied for permanent financing, Hibernia began an aggressive campaign to get him to sign a note with less than favorable terms. Allegedly, this campaign included numerous letters to Mr. Antonini from Hibernia's vice president and its attorney containing harsh language threatening foreclosure on Mr. Hertz's loan and urging Mr. Antonini to close the loan. These facts, according to the Antoninis, show that they were fraudulently induced to sign the promissory note; and, therefore, their consent to obligate themselves is vitiated.
Next, urging the same factual allegations, the Antoninis argue that they relied to their detriment on Hibernia's alleged inappropriate marketing activities and promises for permanent and/or renewed financing. Mr. Antonini claims that he would not have purchased Cypress Manor but for the alleged improper actions of Hibernia. The Antoninis assert that they were swayed by Hibernia's misrepresentations of the profitability of Cypress Manor and relied on them in making the decision to purchase it.
After hearing testimony and reviewing the deposition testimony of Mr. Antonini,[1] the trial court disagreed with arguments on both the fraudulent inducement and detrimental reliance defenses, finding that
the defenses argued by the [Antoninis] lack any credible evidence to support them. Specifically that (sic) the defense of fraud or being miss (sic) led was not proven by the [Antoninis] and said defenses were proven to be totally baseless.

*335 * * *
The credible testimony as a whole shows that there was no detrimental reliance by the [Antoninis], just perjured testimony to try to avoid the consequences of bad business decisions.
Regarding the defense of fraudulent inducement, we note that fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Ballard's Inc. v. North American Land Development Corporation, 28,437 (La.App.2d Cir.6/26/96), 677 So.2d 648. Fraud may also result from silence or inaction. La. C.C. art. 1953. To prove fraud by silence or inaction, the claimant must show there was a duty to disclose information. Ballard's Inc., supra, citing Greene v. Gulf Coast Bank, 593 So.2d 630 (La.1992). Fraud is proved by a preponderance of evidence and may be established by circumstantial evidence. La. C.C. art. 1957.
The district court's findings with respect to a claim of fraud are subject to the manifest error rule. Ballard's Inc., supra, citing Winegeart v. Texas Indus., Inc., 390 So.2d 265 (La.App. 3d Cir. 1980), writ denied, 396 So.2d 886 (La.1981). A court of appeal may not set aside a finding of fact by a trial court in the absence of manifest error or unless it is clearly wrong, and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Nugent v. Phelps, 36,366 (La.App.2d Cir.4/23/02), 816 So.2d 349, writ denied, 02-1153 (La.5/10/02), 815 So.2d 850. We find no manifest error on the part of the trial court regarding this defense.
The record in this case contains evidence sufficient for the trial court to reasonably conclude that Hibernia did not engage in any fraudulent activities regarding the note executed by the Antoninis. Mr. Thompson testified that the bank would not assist the owner of a property in the marketing and sale of the property. Further, Mr. Thompson consistently testified that any commitment on the part of Hibernia (or any other institution for which he had worked) to provide financing would be in writing. Mr. Antonini references letters that he authored and sent to the bank regarding his desire for a long-term or permanent loan or renegotiation of the loan at a later date. There exists, however, no documentary evidence showing that Hibernia ever committed to any other loan arrangement or term other than the note executed by the Antoninis. The only document originating in the bank that references a longer term loan is a letter written by Rodney Barrett, an assistant vice president at Hibernia, to Mr. Antonini, which stated that the bank was considering funding a loan to him and which requested that certain items of information be provided to Hibernia in that regard. This does not constitute a statement of commitment to loan the funds. The record does indicate that the parties were engaged in ongoing discussions and negotiations regarding the possible refinancing of the original note; but, again, there is no evidence, other than Mr. Antonini's self-serving testimony, that the bank ever made a commitment to the Antoninis to provide permanent or long-term financing. The trial court stated emphatically that it made a credibility determination in this case, finding Mr. Antonini's testimony not credible and accepting the testimony of the Hibernia officers. We will not disturb such credibility calls on the part of the fact finder.
In addition, Mr. Antonini submits that the appraisal of Cypress Manor done in *336 1992 was inflated and that he would not have purchased the apartment complex had he known the true profitability (or unprofitability) of the property. A.J. Burns, Jr., the appraiser, testified that he appraised the property at $955,000 in 1992 for "typical management." Mr. Burns explained that "typical management" would immediately bring those units that were un-rentable back to a rentable state of repair to generate additional income. At the time of the 1992 appraisal, there were many units that were in disrepair and un-rentable. According to Mr. Burns, the appraised value is a "higher indicated market value" because it includes income generated from units that would be rented under "typical management" that may be currently vacant at the time of the appraisal. This additional income is capitalized into perpetuity in calculating the value and profitability. He agreed that, if a manager came into the property and did not bring the property up to generate income as a "typical manager" would, the value and profitability would be lower. The trial court gave credit to this testimony instead of the self-serving testimony of Mr. Antonini that the property was represented by Hibernia to be worth more than it actually was.
Likewise, we find no manifest error in the trial court's finding that there was no evidence to support the Antoninis' defense of detrimental reliance. Much the same as their argument regarding fraudulent inducement, the Antoninis state that they relied to their detriment on the representations of the Hibernia personnel regarding the value and profitability in making the decision to purchase Cypress Manor. We find no manifest error in the trial court's rejection of this defense.
The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations or silence. John Bailey Contractor, Inc. v. State, Through Department of Transportation and Development, 439 So.2d 1055 (La.1983); Orr v. Bancroft Bag, Inc., 29,046 (La.App.2d Cir.1/22/97), 687 So.2d 1068; Knight v. State, 30,902 (La. App.2d Cir.9/28/98), 718 So.2d 646. La. C.C. art. 1967 provides:
Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
Detrimental reliance is not favored in our law and is sparingly applied as it bars the normal assertion of rights otherwise present. Miller v. Miller, 35, 934 (La.App.2d Cir.5/8/02), 817 So.2d 1166, writ denied, 02-1890 (La.10/25/02), 827 So.2d 1154. A claim of detrimental reliance must meet three requirements: (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change in position to one's detriment because of the reliance. Robinson v. Healthworks Intern., L.L.C., 36,802 (La.App.2d Cir.1/29/03), 837 So.2d 714, writ not considered, 03-0965 (La.5/16/03), 843 So.2d 1120, citing Edwards v. Conforto, 636 So.2d 901 (La.1993).
As previously stated, the trial court reasonably concluded that Hibernia did not fraudulently misrepresent the value of the property to the Antoninis in an effort to close the loan. The trial court further reasonably concluded that no commitment *337 or promise was made to the Antoninis to provide permanent or long-term financing. In addition, Northeast points out that the Antoninis were involved with the management of Cypress Manor prior to their execution of the promissory note. They had first-hand knowledge of the operation and condition of the property. The elements of detrimental reliance have not been proven in this case and we find no error in the trial court's conclusion on this defense.
Assignment of error number 3: Confusion
In this assignment of error, the Antoninis argue that the note was extinguished by confusion. Sunset Realty, Inc. bought the property at a tax sale. Northeast purchased the note and collateral mortgage from Hibernia bank. The Antoninis argue that Sunset Realty, Inc. and Northeast are alter egos, or the same entity; and, therefore, confusion operates to extinguish the note. The trial court disagreed, finding that:
It is absolutely clear from the documents filed into the evidence and the testimony given that Sunset Realty, Inc. and North East Realty, L.L.C. (sic) are not the same entity and that specifically they are two separate and distinct entities.
La. C.C. art. 1903 provides that "[w]hen the qualities of obligee and obligor are united in the same person, the obligation is extinguished by confusion." We find the Antoninis' assertion of extinguishment by confusion to be misplaced. Even if Sunset Realty, Inc. and Northeast were the same entity as the Antoninis suggest, confusion would not operate to extinguish this note. When Sunset Realty, Inc. purchased the property at the tax sale, the property was transferred free and clear of any encumbrances or mortgages and the delinquent taxes were paid. Simply put, Sunset Realty, Inc. became the owner of the property free and clear. Northeast purchased the note from Hibernia, thereby becoming the mortgage creditor. The Antoninis remained the obligor on the note and that obligation was not affected by Sunset Realty, Inc.'s acquisition of the property or Northeast's acquisition of the note. The doctrine of confusion does not apply in this case.
Even, assuming arguendo, that confusion were applicable to this scenario, we find no manifest error in the trial court's factual finding that Sunset Realty, Inc. and Northeast were two separate and distinct entities. Ownership of the two entities is not the same and counsel for the Antoninis so stipulated. The trial court heard and weighed the evidence regarding the ownership and operation of these entities and reasonably concluded that they are not "alter egos" of each other for purposes of application of the doctrine of confusion.
In light of these findings, we pretermit any discussion of the adequacy of discovery regarding this defense.
Assignment of error number 4: Credit for Hertz settlement
As previously stated, Mr. Hertz guaranteed the Antoninis' indebtedness to Hibernia and subsequently settled with the bank for the undisputed amount of $60,000. The Antoninis argue that they and Mr. Hertz were solidary obligors on the note; and, therefore, they are entitled to a credit for the amount he paid in settlement. We agree.
La. C.C. art. 1803, Remission of debt to or transaction or compromise with one obligor, provides as follows:
Remission of debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary *338 obligors in the amount of the portion of that obligor.
Surrender to one solidary obligor of the instrument evidencing the obligation gives rise to a presumption that the remission of debt was intended for the benefit of all the solidary obligors.
The comments to the article indicate that a release granted in favor of one of joint and several debtors does not discharge the others; but the creditor must deduct from the debt the share of him whom he has released. According to this article, the solidary obligor who has not settled with the obligee is entitled to have the obligee's recovery reduced by the amount of the released obligor's portion of fault or liability.[2]Mott v. Brister's Thunder Karts, Inc., 95-410 (La.App. 3d Cir.10/4/95), 663 So.2d 233, citing La. C.C. art. 1803, Comment (b). By express terms of the promissory note, Mr. Hertz, as guarantor, and the Antoninis, as borrowers, were solidarily liable for the indebtedness. Through compromise and settlement for the amount of $60,000, Hibernia released Mr. Hertz from his obligation on the note. We find, therefore, that, while Northeast is entitled to judgment on the note, this judgment must be additionally reduced by the amount of the settlement paid by Mr. Hertz.[3] We amend the judgment accordingly.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to reflect a credit to the principal obligation owed by the Antoninis to Northeast Realty, L.L.C. in the additional amount of $60,000, representing the settlement between Judah Hertz, solidary obligor, and Hibernia National Bank. In all other respects, the judgment of the trial court is affirmed.
AMENDED, AND, AS AMENDED, AFFIRMED.
NOTES
[1] At the time of trial, Mr. Antonini was incarcerated in California serving a sentence for bank fraud and could not be present.
[2] This principle has been consistently applied in the tort setting as well. A plaintiff's settlement with a solidary obligor reduces his recovery against the non-settling tortfeasor by the percentage of fault of the released solidary obligor, providing the remaining defendant proves at trial that the released party was a joint tort-feasor and, therefore, solidarily liable. Barnes v. Reed, 32,380 (La.App.2d Cir. 10/29/99), 743 So.2d 936; Taylor v. U.S. Fidelity & Guar. Ins. Co., 630 So.2d 237 (La. 1993).'
[3] Northeast points to the following language contained in the "Waivers" section of the promissory note in arguing that the credit should not be awarded: "Borrower and each guarantor further severally agree that discharge or release of any party who is or may be liable to Lender for the indebtedness represented hereby ... shall not have the effect of releasing any other party or parties, who shall remain liable to Lender...." This language merely preserves the lender's right to seek recovery of the balance due on an obligation if one solidary obligor is discharged for a portion of the indebtedness. This language does not speak to whether the lender must credit the indebtedness for the amount received from the released or discharged solidary obligor.