884 So.2d 665 (2004)
Arthur P. BOUDREAUX, II
v.
Mark JEFF, Dion John Authement, Rhonda Tabora, and Elizabeth Hays.
No. 2003 CA 1932.
Court of Appeal of Louisiana, First Circuit.
September 17, 2004.
Rehearing Denied November 9, 2004.
*666 Eddie N. Pullaro, Houma, for Plaintiff-Appellee Arthur P. Boudreaux, II.
Brent J. Rhodes, Houma, for Defendant-Appellant Dion John Authement.
Before: CARTER, C.J., PARRO, and GUIDRY, JJ.
PARRO, J.
Dion John Authement appeals a judgment finding him solidarily liable with Mark Jeff for the payment of $45,000, plus interest and costs, to Arthur P. Boudreaux, II, based on a finding that Authement and Jeff conspired to defraud Boudreaux of that amount in connection with a sale of real property. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
Boudreaux had inherited from his father two pieces of real property on either side of Grand Caillou Highway 57 in Terrebonne Parish. The property on the east side of the highway had a house on it; the property on the west side of the highway was known as the "batture property," because it was bounded on the west by Bayou Grand Caillou. Boudreaux's sister, Becky, had inherited from their father the property adjacent to and south of her brother's lots on both sides of the highway. Becky was married to Authement at the time, and she transferred an undivided interest to him in order for this property to be co-owned. When they divorced, the community property settlement included a transfer of full ownership of Becky's batture property to Authement.[1] Therefore, in March 2001, when the *667 events leading to this litigation occurred, Authement owned the batture property to the south of Boudreaux's batture property and had a small business there; he was interested in buying Boudreaux's batture property. However, due to the strained family relationships after his divorce from Becky, Authement doubted that Boudreaux would sell it to him.
Enter Mark Jeff. Jeff was acquainted with Authement and Boudreaux, and in early 2001, he learned that Authement was interested in Boudreaux's batture property. In short order, Jeff became the "middle man" to buy the property from Boudreaux and then sell it to Authement.[2] Jeff learned that Boudreaux's property was in foreclosure and that he was willing to sell it to him.[3] On March 12, 2001, Boudreaux signed a letter to a law firm in Monroe, Louisiana, which was handling the foreclosure of his property, and gave the letter to Jeff; it authorized Jeff "to pay off my home mortgage of $34,000. To releave [sic] me of that debt." Jeff and Authement made two trips to the foreclosing attorneys' offices in Monroe to find out the exact mortgage balance and try to pay it. At some point, Jeff contacted Elizabeth Hays, a notary public who worked in a Houma law office, to prepare the sale documents.
The documents in the record include the following: (1) a bill of sale dated March 26, 2001, transferring ownership of all of Boudreaux's property to Jeff for a purchase price of $39,498.53,[4] which was signed by Boudreaux, Jeff, and two witnesses, was notarized by Hays, and was recorded in the parish conveyance records on March 30, 2001; (2) a second bill of sale for the same property dated March 27, 2001, transferring ownership of all the property from Jeff to Authement for the amount of $39,498.53, which was signed by Jeff, Authement, and two witnesses, was notarized by Hays, and was recorded in the parish conveyance records on April 2, 2001; (3) an unrecorded bill of sale from Jeff to Authement dated March 27, 2001, which had a sale price for the same property of $84,498.53, had the signatures of Jeff, Authement, and two witnesses, and had the signature and notary seal of Hays;[5] and (4) a demand promissory note from Jeff to Boudreaux in the amount of $45,000, dated March 30, 2001, which was signed by them and two witnesses and was notarized by Hays. The record also has a copy of a cashier's check drawn by Authement on March 29, 2001, payable to the Monroe law firm in the amount of $39,486.88. A deposit slip shows this amount was re-deposited in Authement's account on March 30th. There is also a copy of a wire transfer showing Boudreaux's mortgage balance was paid off from Authement's account on March 30, 2001, and a receipt showing Authement *668 bought homeowner's insurance on April 2, 2001. The record also contains documentary evidence that Authement paid to or on behalf of Jeff various sums of money after these transactions took place$450 on April 4th, $400 on April 28th, $200 on May 12th, and $200 on June 15th.
The parties disagree about virtually every aspect of the factual circumstances surrounding this transaction and its documentation. Boudreaux said he went to the law office to meet with Hays, whom Jeff had identified as his attorney, but Jeff did not show up, and Boudreaux was reluctant to sign any documents without him there. Boudreaux claimed Hays advised him the $39,498.53 document was just "to clear the title" on his property and get the mortgage paid off so he could sell it "with no strings attached." He interpreted the phrase, "[t]he parties dispense with the Certificate of Mortgages" in that document as verifying what she had told him. Although the date on the document is March 26th, Boudreaux said he probably signed the $39,498.53 bill of sale on the 30th. He also said that before he signed it, Jeff showed him a cashier's check to prove he had the funds to pay off the mortgage, but had his thumb over the remitter's (Authement's) name.[6] Boudreaux said he and Jeff returned on Monday, April 2, to complete the transaction, at which time Jeff signed the $45,000 promissory note to him for the balance.[7] Boudreaux said Hays told him he had to wait three days before he could collect on the promissory note, and he accepted that explanation of why he did not get the funds immediately. Boudreaux also testified that Hays preparedand he and Jeff signeda bill of sale showing the full purchase price of the property he sold to Jeff was $84,498.53. Boudreaux did not recall when they signed this document, and he believed it must have been "shredded" at Hays' office, because it did not show up during the litigation. Boudreaux summarized the situation as follows:
I signed the paper for 84,000 something. Where that paper went, I don't know. Okay? I was told that the $84,000 shows the sale of the house. After the mortgage is cleared for $39,000, they'll subtract that 39,000 from the 84 plus and that gives me the 45. The promissory note was for the 45,000.
Jeff's version of events is as follows. After discussing the Boudreaux property with Authement, Jeff agreed to be his "middle man" to buy both pieces for him. Jeff told Boudreaux he was interested in buying the house for his mother, when in fact he intended to sell it and the batture property to Authement. Jeff claimed Boudreaux told him the price for all the property was the mortgage payoff, plus $45,000 in equity for his home. Jeff said he went back across the street and gave this information to Authement. Eventually, Boudreaux gave him a letter to allow him to pay off the mortgage, and he and Authement made two trips to Monroe to try to accomplish this. At some point, Authement told Jeff, "get the house any way [you] can get it and `f____Artie."' Authement said he was not going to pay Boudreaux the $45,000. But Authement also told Jeff he was going to mortgage the property and pay Jeff the $45,000at which point Jeff said he intended to pay it *669 to Boudreaux. Jeff said every time he met with Authement before and after the sale, "on a daily basis," he would ask him for money and Authement would give him several hundred dollars.[8] Jeff made the arrangements with Hays, who worked at his attorney's office, to perform the acts of sale. When he had Authement's cashier's check for the payoff balance, he showed it to Boudreaux and took him to Hays' office. Jeff said Hays had prepared four documentstwo bills of sale showing the sale amount as $39,498.53, and two bills of sale in the amount of $84,498.53, the full price. She explained the one with the lower amount was just for the mortgage payoff. He and Boudreaux executed the two sale documents with different amounts showing the property transfer from Boudreaux to Jeff. When Jeff and Authement later executed the two sale documents with different amounts showing the property transfer from Jeff to Authement, Jeff took the document showing the $84,498.53 sale price to be sure he could collect from Authement. Jeff said Hays "shredded" the bill of sale he and Boudreaux had signed showing the higher price, and he did not want the corresponding document between him and Authement to meet the same fate.[9] Several days later, he and Boudreaux went back to Hays and executed the $45,000 promissory note for the balance.
Authement testified that he wanted to buy only the batture property from Jeff, but they had never agreed on the price for which Jeff would sell it to him. Jeff did all the talking with Boudreaux, and Authement never knew what their deal was. However, Authement said he saw the letter Jeff had from Boudreaux about paying off the mortgage, and believed that meant Boudreaux was agreeing to sell Jeff the property for the mortgage payoff, which "amazed" him. Authement said when he went to the law office to execute the sale of just the batture property, he understood that a sale of all of the property had already taken place between Boudreaux and Jeff. In fact, he said he was sitting in the reception area of the law firm while their transaction took place, and could overhear their discussion of the price as being the mortgage balance. Authement said he only agreed to buy the entire property when Jeff told him, right before the sale to him, that Jeff could not come up with the money for the property.[10] Authement said that on one of their trips to Monroe, he got a cashier's check from his bank for the mortgage payoff and attempted to satisfy Boudreaux's debt on the property, but the law firm would not handle the transaction that way. The mortgage payoff was ultimately accomplished after Authement got a second cashier's check on March 29th and had the funds wire transferred to the mortgage company. Authement denied ever agreeing to *670 pay an additional $45,000 for the property. He said he knew nothing about Jeff's promissory note to Boudreaux until Boudreaux brought it up in the subsequent eviction proceedings. Although he acknowledged that the bill of sale showing the higher price appeared to have his signature, Authement noted "it wasn't attached to this page" showing the price. He could not recall signing it and claimed he never saw it until Jeff faxed it to him in July 2001. Authement admitted giving Jeff various sums of money before and after the sale, but said they were for odd jobs, some furnishings left at Boudreaux's house, car expenses, and to bond him out of jail after some mishap. Authement claimed he also felt some obligation to Jeff, since Jeff was not making any profit on the sale of the house.
Hays said she knew Jeff, because he was a client of one of the attorneys in the firm; Jeff contacted her to document the transactions. However, Hays denies almost every aspect of Boudreaux's and Jeff's account, except that they signed the $39,498.53 bill of sale, which she prepared and notarized, and that they returned several days later for her to prepare and notarize a $45,000 promissory note from Jeff to Boudreaux, which she did. She said the only price she was ever told concerning the Boudreaux property was the mortgage payoff balance of $39,498.53, and she did not see any money change hands at any time. Hays also testified that the two $39,498.53 bills of sale were executed on the dates shown in her presence with the two witnesses present and witnessing the signatures.[11] Hays said she gave both original $39,498.53 bills of sale to the buyers to record in the parish conveyance records, and believed they recorded the sales immediately after the documents were executed. She also prepared and notarized a second original $39,498.53 bill of sale from Jeff to Authement, which they said was needed to pay off the mortgage, and gave it to Authement. Although the unrecorded $84,498.53 bill of sale document from Jeff to Authement is in the same format and wording as that used by Hays for the recorded sales and contains what appear to be the signatures of Authement and Jeff, two witnesses, and Hays, along with the impression of her notary seal, Hays denied ever preparing, signing, or notarizing any document showing the higher sales price. She pointed out some differences in the font size on the $84,498.53 document, and denied that the signature on that document was hers. She also said she discovered on March 30th that her notary seal had disappeared, and she had to order a new one in early April. Hays stated that Jeff and Boudreaux told her the $45,000 promissory note, which was dated March 30th, involved an unrelated transaction between them concerning some other property. She said she was not in the office on April 2nd, when they claimed to have signed that note.
Just about the only uncontested facts in this case are that Jeff did not get $45,000 from Authement, and he did not pay Boudreaux what he owed on his promissory note. Boudreaux continued to live in the house, and Authement had him evicted. Boudreaux said he did not know until Authement had him evicted that Authement, rather than Jeff, owned the house. Authement confirmed that Boudreaux probably did not know about his purchase of the house from Jeff until the eviction suit.
*671 On March 25, 2002, Boudreaux filed this lawsuit against Jeff, alleging that despite amicable demand, Jeff had not paid anything on the promissory note, which was payable on demand. Boudreaux also named Authement, Hays, and Rhonda Tabora[12] as defendants, claiming they conspired with Jeff to fraudulently deprive him of the full price of his property. Jeff did not answer the lawsuit, and on February 3, 2003, a default judgment on the promissory note was confirmed and rendered against him in favor of Boudreaux for $45,000, plus legal interest from the date of the note until paid, plus 25% attorney fees and court costs. The fraud and conspiracy claim was tried, and on February 7, 2003, a judgment was signed, dismissing with prejudice Boudreaux's claims against Hays and Tabora, but finding Authement conspired with Jeff to defraud Boudreaux, and was therefore solidarily liable with Jeff for the payment of $45,000 to Boudreaux, plus interest and costs. Authement has appealed this judgment.

APPLICABLE LAW

Standard of Review
The appellate court's review of factual findings is governed by the manifest errorclearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
Where factual findings are based on determinations regarding the credibility of witnesses, the trier of fact's findings demand great deference and are virtually never manifestly erroneous or clearly wrong. Secret Cove, L.L.C. v. Thomas, 02-2498 (La.App. 1st Cir.11/7/03), 862 So.2d 1010, 1016, writ denied, 04-0447 (La.4/2/04), 869 So.2d 889. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Barham & Arceneaux v. Kozak, 02-2325 (La.App. 1st Cir.3/12/04), 874 So.2d 228, 240, writ denied, 04-0930 (La.6/4/04), 876 So.2d 87.

Fraud
Under that portion of the Louisiana Civil Code regarding conventional obligations or contracts, fraud is defined as a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. LSA-C.C. art.1953; Hibernia Nat'l Bank v. Antonini, 37,836 (La.App. 2nd Cir.12/10/03), 862 So.2d 331, 335. Fraud need only be proved by a preponderance of the evidence and may be established *672 by circumstantial evidence. LSA-C.C. art.1957; McDonough Marine Serv., a Div. of Marmac Corp. v. Doucet, 95-2087 (La.App. 1st Cir.6/28/96), 694 So.2d 305, 309. Intent to defraud and loss or damage are two essential elements to constitute legal fraud. McDonough Marine Serv., 694 So.2d at 309. The trial court's findings with respect to a claim of fraud are subject to the manifest error standard of review. Ballard's, Inc. v. North American Land Dev. Corp., 28,437 (La.App. 2nd Cir.6/26/96), 677 So.2d 648, 651; Harmon v. Schamberger, 536 So.2d 579, 581 (La. App. 1st Cir.1988).
Not all fraud actions are contract claims. The well-recognized rule is that when a party has been damaged by the conduct of another arising out of a contractual relationship, the former may have two remedies, a suit in contract, or an action in tort, and may elect to recover his damages in either of the two actions. Bunge Corp. v. GATX Corp., 557 So.2d 1376, 1385 (La. 1990). A party who is injured by fraud and deceit of another has a cause of action for damages. Deville v. Leonards, 457 So.2d 311, 313 (La.App. 3rd Cir.1984). Where fraud is alleged as the basis for relief, all persons who participated in the alleged fraud and those who are beneficiaries are proper parties to the suit. See LSA-C.C. arts. 2315 and 2324; Dohm v. O'Keefe, 458 So.2d 964, 965 (La.App. 4th Cir.), writ denied, 460 So.2d 1046 (La. 1984); Pittman v. Piper, 542 So.2d 700, 702 (La.App. 4th Cir.1989).

Solidary Liability for Conspiracy/Intentional Act
He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. LSA-C.C. art. 2324(A). The actionable element in a claim under this Article is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually commit in whole or in part. Ross v. Conoco, Inc., 02-0299 (La.10/15/02), 828 So.2d 546, 552. The purpose of solidary liability is to compel any tortfeasor to pay the entire judgment. Id. An obligation may be solidary though it derives from a different source for each obligor. LSA-C.C. art. 1797. The sources of the obligations are irrelevant so long as the obligors are obligated to repair the same damage. Rizer v. American Sur. & Fid. Ins. Co., 95-1200 (La.3/8/96), 669 So.2d 387, 389. An obligation is solidary among debtors when they are obliged to the same thing, so that each may be compelled for the whole, and when payment by one exonerates the other toward the creditor. Id. A failure to perform a solidary obligation through the fault of one obligor renders all the obligors solidarily liable for the resulting damages. LSA-C.C. art. 1800. Article 2324(A) imposes solidary liability only for compensatory damages. Ross, 828 So.2d at 552. One hundred percent solidarity is applicable to the intentional tortfeasors. Frazer v. St. Tammany Parish School Bd., 99-2017 (La.App. 1st Cir.12/22/00), 774 So.2d 1227, 1236 n. 6, writ denied, 01-0233 (La.3/23/01), 787 So.2d 1001; see also Veazey v. Elmwood Plantation Assoc., Inc., 93-2818 (La.11/30/94), 650 So.2d 712, 737 n. 8.
Article 2324(A) requires a meeting of the minds or collusion between the parties for the purpose of committing wrongdoing. Evidence of such a conspiracy can be actual knowledge of both parties or overt actions with another, or can be inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator. Stephens v. Bail Enforcement of La., 96-0809 (La.App. 1st Cir.2/14/97), 690 So.2d 124, 131, writ denied, 97-0585 (La.4/18/97), *673 692 So.2d 454. If a conspiracy is conceived and executed, and a private injury results, the one so injured has a right of action against all of the conspirators. Strahan v. State Through Dep't of Agric. and Forestry, 93-0374 (La.App. 1st Cir.8/25/94), 645 So.2d 1162, 1165, writ denied, 95-0040 (La.2/17/95), 650 So.2d 256.

Authentic Act
An authentic act is a writing executed before a notary public in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed. LSA-C.C. art. 1833. A transfer of immovable property must be made by authentic act or by act under private signature. LSA-C.C. art. 1839. Between two parties to an authentic act, parol evidence is admissible to show fraud, mistake, illegality, want or failure of consideration, or to explain an ambiguity when such explanation is not inconsistent with the written terms. See LSA-C.C. art. 1848; Scafidi v. Johnson, 420 So.2d 1113, 1115 (La. 1982); Holliday v. Holliday, 00-0533 (La. App. 1st Cir.8/17/01), 795 So.2d 423, 428, amended on rehearing on other grounds, 00-0533 (La.App. 1st Cir.9/28/01), 797 So.2d 774.

DISCUSSION
This case is all about credibilityand the lack of it. From the oral reasons of the trial judge, it is clear that he listened carefully to the testimony of all the witnesses, examined the documentary evidence, compared the testimony to the documents, noted inconsistencies in the testimony and documents, and evaluated the believability of the circumstances described by the parties. Neither Boudreaux, Jeff, Authement, nor Hays was considered by the judge as totally believable. Yet, after considering all the evidence, he concluded, among other things, that: (1) Boudreaux intended to sell his property for the mortgage payoff, plus $45,000; (2) Boudreaux told Jeff this was the sale price, and Jeff told Authement this was the sale price; (3) Jeff intended to defraud Boudreaux of the $45,000; (4) Authement knew of Jeff's intention and ultimately conspired with him to get Boudreaux's property for just the mortgage payoff, using Jeff as the means of doing so; and (5) therefore, Authement was solidarily liable with Jeff for the $45,000, plus legal interest.[13]
In two of his assignments of error, Authement argues that the trial court manifestly erred and is legally incorrect for holding Authement liable to Boudreaux for contractual fraud when Boudreaux admitted the validity of the sale, did not ask for rescission, did not seek to vitiate his consent to the contract, and sought only the recovery of the balance of the purchase price. However, we do not consider the trial judge's references to the fraud articles in the Civil Code as implying that he found or imposed liability for contractual fraud in this case. See LSA-C.C. arts. 1953-1958. Rather, he correctly used those articles to clarify the evidentiary standard for proving fraud and to conclude that the damages for the fraud should not include attorney fees, since there was no *674 rescission of the contract sought or awarded.
In this case, the trial court based Authement's liability on Louisiana Civil Code article 2315, under which "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." When the action is performed intentionally, with the assistance of a co-conspirator, both persons are solidarily liable for the damage caused by their actions. LSA-C.C. art. 2324(A). We have painstakingly reviewed the record in this case, and we find no manifest error in the trial court's conclusions concerning this transaction, most of which were based on credibility determinations that only he could make and to which we must give great deference. Moreover, we find no legal error in the trial court's imposition of liability on Authement for intentional, fraudulent conduct. As noted by the Louisiana Supreme Court, a person who has been damaged by the conduct of another arising out of a contractual relationship may have a suit in contract or an action in tort, and may elect to recover his damages in either of the two actions. Bunge Corp., 557 So.2d at 1383. The record provides ample support for the trial court's conclusion that Authement and Jeff conspired to intentionally deprive Boudreaux of $45,000 of the purchase price for his property. As such, they are solidarily liable for that amount.[14]
Authement contends that, since a default judgment on the promissory note had already been rendered in favor of Boudreaux and against Jeff for that amount, the judgment in this case is tantamount to double recovery. However, the trial court specifically stated that the judgment was solidary with the amount owed by Jeff on the note. The law is clear that an obligation may be solidary, even though it derives from a different source for each obligor. Since payment of the debt by one remits the debt of the other, there is no possibility of double recovery for Boudreaux.
With reference to the damages, Authement further contends that even if this court agrees that he is liable to Boudreaux for some amount, the trial court erred in imposing $45,000, because the value of the property was not properly established and the house had been "trashed" before Authement took possession of it. We find no merit in these arguments. Whether the house was worth $10 or $100,000, Authement contrived with Jeff to deprive Boudreaux of a portion of the price they knew he had placed on his property. That portion was $45,000. Therefore, this is a fair measure of the compensatory damages attributable to their actions.[15]

CONCLUSION
Based on the foregoing, the judgment is affirmed. All costs of this appeal are assessed against Authement.
AFFIRMED.
NOTES
[1] Authement also got 20% of the proceeds from the sale of the house and property on the east side of the highway. Although appraised at one point for $180,000, Becky eventually sold it for about $100,000 and gave about $20,000 to Authement.
[2] Initially, their discussions may have involved Authement's purchase of just the batture property, with Jeff claiming he wanted to buy the house for his mother. However, the final agreement and sale included all of Boudreaux's property on both sides of the highway.
[3] Jeff and Boudreaux claim the purchase price was the mortgage balance plus equity of $45,000. Authement claims Jeff did not tell him about the $45,000, and he believed the purchase price was just the balance on the mortgage.
[4] This amount apparently was the payoff balance on Boudreaux's mortgage, including late fees and attorney fees incurred in the foreclosure proceedings.
[5] The authenticity of this document is contested by Hays and Authement, who did not attest to their signatures on it. We find no error in the trial court's admitting this document into evidence based on Jeff's identification of it, and note that neither the trial court nor this court relied upon its authenticity.
[6] The copies of the two cashier's checks involved in this transaction are dated March 28th and March 29th.
[7] However, at another point in his testimony, Boudreaux said he thought he may have signed all the paper work on Monday, and reiterated that the promissory note was "at that time with her at the same time of signing those papers."
[8] Jeff's cousin, Calvin Clay, was with Jeff on several occasions when he met with Authement. Clay said he heard Authement's comments to Jeff that he should get the property any way he could and "f____Artie." He also confirmed that every time the two met, Authement gave Jeff money, and said Authement promised Jeff that if he helped him get the property, he would give Jeff $5,000 so he could buy an SUV. According to Clay, after this lawsuit was filed, he heard Authement offer Jeff $20,000 to "just disappear" and not testify at trial.
[9] Jeff also said Hays signed the witnesses' names on the sale documents from him to Authement.
[10] However, Jeff clearly never had any money in the deal. The attempts to pay off Boudreaux's mortgage always involved only Authement's money, and always involved the full amount of the mortgage payoff. Authement claimed he had an unsecured loan from his banka line of creditto build a new shop, and he was able to draw on those funds to buy the property on short notice.
[11] We note, however, that a cursory comparison of those two recorded documents shows that the purported signature of a receptionist at the law firm who appears as a witness on both documents, Dawn Pellegrin, was written and even spelled differently on the two recorded bills of sale that Hays prepared and notarized.
[12] Tabora was living with Authement when these transactions occurred. At the time of trial, she and Authement were living in the house purchased from Boudreaux, which they had renovated.
[13] The oral reasons further noted that although there were inconsistencies in Hays' testimony and she was apparently negligent in preparing the transaction documents, there was insufficient evidence that she was involved in the conspiracy or intended to defraud Boudreaux. Therefore, the claims against her were dismissed. As there was no evidence that Tabora knew anything about the scheme, other than that Authement and Jeff were involved in buying the property from Boudreaux, the claims against her were also dismissed.
[14] In addition, Jeff is liable for 25% attorney fees, in accordance with the judgment on the note.
[15] Accordingly, we do not address Authement's arguments about the admissibility of or weakness of the evidence concerning the value of Boudreaux's property.