GARRETT, J.
_JjIn this case involving the purchase of land, the defendants, Calvin Clay, Sr., and Bessie Clay, appeal from trial court decisions in favor of the plaintiff, Deborah Lee Benton, and the third party defendant, Hudson Lane Title Company, LLC (“Hudson Lane”). The trial court found that Mr. Clay knowingly and intentionally made misrepresentations regarding Ms. Benton’s ability to participate in the land purchase which breached their agreement to purchase the property as co-owners. The trial court granted specific performance in favor of Ms. Benton and awarded her damages and attorney fees. The trial court further ruled that the Clays’ third party demands against Hudson Lane for damages were barred by prescription and that the Clays had no cause of action against Hudson Lane for contribution or indemnity. For the following reasons, we affirm in part and reverse in part the trial court judgments.
FACTS
Ms. Benton and Mrs. Clay were lifelong friends. Ms. Benton’s mother was Mrs. Clay’s godmother. The Clays live near Ms. Benton’s mother in Union Parish. Plum Creek Southern Timber, LLC (“Plum Creek”), owned a 29-acre tract of land adjacent to the property occupied by Ms. Benton’s mother. Plum Creek announced plans to sell this and other property at an auction. Ms. Benton and Mr. Clay were both interested in buying the land. They saw each other at the auction orientation meeting held in June 2007, and agreed to purchase the property together. Because other parties were interested in the tract, they thought they had a better chance of winning the bid if they combined their resources.
|2On June 28, 2007, Ms. Benton and Mr. Clay were successful in submitting the winning bid for the property, $31,900. Hudson Lane, a title company wholly owned by the law firm of Hudson, Potts & Bernstein, LLP, represented Plum Creek at the auction. Stephen North, an attorney for Hudson Lane, and Rita Tucker, a paralegal, handled the paperwork. Hudson Lane had Ms. Benton and Mr. Clay sign a “Purchase and Sale Agreement” with Plum Creek which obligated them to buy the property. They each paid 1/2 of the required $3,190 in earnest money and executed an earnest money deposit escrow agreement. They evidenced their agreement to the form of the non-warranty deed that would be used at closing by initialing a form deed. Hudson Lane set the closing for July 27, 2007. Mr. Clay was to be the contact person for the two buyers and furnished his contact information to Hudson Lane. Correspondence from the title company concerning closing costs was addressed to both Mr. Clay and Ms. Benton and sent to Mr. Clay’s address in Sterling-ton. Mr. Clay realized he would be out of town for a family reunion on the original closing date and requested that the closing be rescheduled. Ms. Benton was never notified of the new date, August 15, 2007.
On July 18, 2007, Ms. Benton received $18,000 from her 401 (k) account to fund her portion of the purchase price and in *217 formed Mr. Clay that she had her money.[1] Mr. Clay made arrangements to borrow money from Marion State Bank to fund his part of the purchase price. He sent a |Rloan application to Ms. Benton and suggested that she contact the bank about getting a loan for the purchase. Although Ms. Benton had her funds readily available, she did talk to personnel at the bank and was informed that she did not qualify for a loan.
Ms. Benton alleged that Mr. Clay falsely informed Hudson Lane that she did not have the money to complete the sale of the property and would not be participating in the closing. On August 15, 2007, Mr. and Mrs. Clay appeared at the closing and purchased the property in their names. They borrowed the money for the entire purchase price and executed a mortgage. They then proceeded to have timber cut from the property and received approximately $12,000 from timber sales.[2] They sold dirt from the property and allowed the property to be used for storage purposes. The amounts derived from these activities were never established at trial.
After learning that the Clays had purchased the property, Ms. Benton went to Hudson Lane with her $18,000 check and inquired as to what had transpired. Mr. North advised he was under the impression that Ms. Benton could not afford the property and was not interested in concluding the sale. Mr. North immediately called Mr. Clay and informed him that he needed to come into the office to straighten out the matter. Mr. Clay was noncommittal and nonresponsive. His refusal to resolve the matter amicably resulted in this protracted litigation.
Ms. Benton filed a “Petition for Damages and to Set Aside Sale” against the Clays on April 3, 2008. She sought to rescind the conveyance of |4the property from Plum Creek to the Clays, in order that the property could be conveyed to her and the Clays pursuant to the “Purchase and Sale Agreement,” together with monetary damages. The Clays admitted that the “Purchase and Sale Agreement” had been executed. However, they claimed that Ms. Benton failed to meet the deadline for the scheduled closing and failed to provide her share of the funds for the sale.
On February 7, 2011, after the matter had been set for trial, the Clays filed a pleading entitled “Supplemental Answer: Reconventional Demand and Cross-Claim,” which added an additional party— Hudson Lane.[3] The Clays asserted claims for damages against the title company and also sought contribution and indemnity if judgment was rendered in favor of Ms. Benton and against the Clays. They also asserted a reconventional demand against Ms. Benton for malicious prosecution.
Ms. Benton denied all allegations lodged against her in the new pleadings, urged that the Clays be ordered to convey a 1/2 interest in the property to her, and requested damages, attorney fees, and costs. Hudson Lane filed numerous exceptions, including exceptions of peremption and prescription, no cause of action and no *218 right of action.[4] A motion to sever the trial of the demands between Ms. Benton and the Clays from the Clays’ demands against Hudson Lane was filed by Ms. Benton. She pointed out that the upcoming trial on the main demand had been scheduled as a first |ssetting. She alleged that the Clays filed their demands against Hudson Lane in violation of the scheduling order and as a dilatory tactic. She contended that Hudson Lane’s exceptions could not be disposed of before the trial date and awaiting a ruling on the exceptions would unduly delay the proceedings. Hudson Lane consented to the severance and the trial court granted the motion to sever.
Trial was held in May and September 2011. In detailed written reasons for judgment, the trial court found that Mr. Clay knowingly and intentionally misrepresented to Hudson Lane that Ms. Benton was not able to obtain funds and was not going forward with the transaction. The trial court found that it was uncontrovert-ed that the parties had entered into an agreement to purchase the property jointly. Mr. Clay breached this agreement through his bad faith and fraud and the plaintiff was entitled to specific performance and damages. The trial court signed a judgment in favor of Ms. Benton and against the Clays, for specific performance of the agreement to jointly purchase, in equal portions, an undivided 1/2 interest each in and to the property. The trial court ordered the Clays to do all things necessary to have Ms. Benton recognized as the record owner of a 1/2 interest in the property free and clear of any mortgages, liens, or other encumbrances. All fees, costs, and expenses, including legal expenses were to be borne by the Clays. The judgment ordered Ms. Benton to pay the Clays $15,950 (her 1/2 of the purchase price), subject to a credit for $1,595 previously paid in earnest money, and also subject to a credit for $5,959.26 (1/2 of the $11,918.52 timber sales). Thus, after application of all credits, |(iMs. Benton owed the Clays $8,395.74. The court also awarded Ms. Benton attorney fees in the amount of $8,300. The Clays’ reconven-tional demand against Ms. Benton for malicious prosecution was dismissed with prejudice.
The trial court also considered Hudson Lane’s exceptions. Hudson Lane contended that the Clays’ demands for damages based upon alleged legal malpractice were barred by peremption because they were brought more than three years after the alleged malpractice and the Clays’ other demands for damages were barred by prescription because they were brought more than one year after the alleged tort giving rise to the claim. Hudson Lane further argued that the Clays had no cause of action or right of action for contribution or indemnity. The Clays filed no written opposition to these exceptions and merely presented oral argument. The trial court took the matter under advisement and later issued an extensive oral ruling sustaining some exceptions and finding others to be moot.
The Clays appealed suspensively from the judgment in favor of Ms. Benton and devolutively from the judgment sustaining Hudson Lane’s exceptions. The Clays raise numerous assignments of error.
MISREPRESENTATION
The Clays contend the trial court erred in its factual findings that Mr. Clay know *219 ingly and intentionally misrepresented to Hudson Lane that Ms. Benton did not have the funds to purchase the property and was not going forward with the transaction. They argue Ms. Benton did not prove that the defendants perpetrated a fraud on her and that she did not present any evidence of misrepresentation, suppression, or omission of the truth. They 17deny telling anyone at Hudson Lane that Ms. Benton was not participating in the closing. They claim that Ms. Benton did not prove any intent on their part to obtain an unjust advantage. Indeed, at trial, Mr. Clay maintained that Ms. Benton; her brother, Mr. Lee; Mr. North; and Ms. Tucker were all lying and that he simply had no idea why Ms. Benton was not at the closing.
Discussion
The trial court made very specific and detailed factual findings that the defendants acted in bad faith and in a fraudulent manner. The trial court determined that the plaintiff, her brother, Mr. North, and Ms. Tucker were credible and that the Clays were not.
Under our law, fraud is defined as a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La. C.C. art.1953; Hibernia Nat’l Bank v. Antonini, 37,836 (La.App. 2nd Cir.12/10/03), 862 So.2d 331; Boudreaux v. Jeff, 2003-1932 (La.App. 1st Cir.9/17/04), 884 So.2d 665. Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence. La. C.C. art.1957; Boudreaux v. Jeff, supra. Intent to defraud and loss or damage are two essential elements to constitute legal fraud. Boudreaux v. Jeff, supra. Fraud may be predicated on promises made with the intention not to perform at the time the promise is made. Automatic Coin Enter., Inc. v. Vend-Tronics, Inc., 433 So.2d 766 (La.App. 5th Cir.1983), writ denied, 440 So.2d 756 (La.1983). The trial court’s findings with respect to a claim of fraud are subject to the manifest error standard of review. Boudreaux v. Jeff, supra.
The elements of a claim for intentional misrepresentation are: (1) a misrepresentation of a material fact; (2) made with intent to deceive; and (3) causing justifiable reliance with resultant injury. See Kadlec Med. Center v. Lakeview Anesthesia Assocs., 527 F.3d 412 (5th Cir.5/8/08), cert. denied, 555 U.S. 1046, 129 S.Ct. 631, 172 L.Ed.2d 611 (2008).
An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation. La. C.C. art.1997, Revision Comment (b). The term bad faith means more than mere bad judgment or negligence; it implies the conscious doing of a wrong for dishonest or morally questionable motives. Bond v. Broadway, 607 So.2d 865 (La.App. 2d Cir.1992), writ denied, 612 So.2d 88 (La.1993).
It is well settled that a court of appeal may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. See Rosell v. ESCO, 549 So.2d 840 (La.1989). In Welch v. Willis-Knighton Pierremont, 45,554 (La.App.2d Cir.11/17/10), 56 So.3d 242, writs denied, 2011-0075 (La.2/25/11), 58 So.3d 457, and 2011-0109 (La.2/25/11), 58 So.3d 459, this court explained that, to reverse a trial court, the appellate court must find that a reasonable factual basis does not exist in the record for the finding and that the determination is clearly wrong. Where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Welch v. Willis- *220 Knighton Pierremont, supra. When findings are based on determinations | regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell v. ESCO, supra; Audio Plus, Inc. v. Lombardino, 47,488 (La.App.2d Cir.9/20/12), 105 So.3d 725.
Our review of the record fully supports the trial court’s findings that Mr. Clay knowingly and intentionally made misrepresentations, breached the agreement he had made with the plaintiff, and acted in bad faith and in a fraudulent manner. Ms. Benton testified as to the agreement she had with Mr. Clay to purchase the property together. She introduced into evidence the checks she used to pay her portion of the earnest money and the check from her 401 (k) retirement account, demonstrating that she had the funds to complete the sale and corroborating her version as to what occurred. She also introduced into evidence the Purchase and Sale Agreement that she and Mr. Clay jointly executed along with other documents signed that same date. Hudson Lane was to send all communication regarding the closing to Mr. Clay’s address. She became aware that Mr. Clay had a conflict on the original closing date. She was never contacted regarding the new closing date and Mr. Clay would not return her phone calls. When she later spoke to Mr. Clay sometime in August, he denied knowing when the closing would take place, but said he would let her know.
Ms. Benton’s brother, Ralph Lee, corroborated her testimony. He talked with Mr. Clay about the purchase and Mr. Clay knew that Ms. |10Benton had her money for the purchase from her 401(k) retirement account. Despite this knowledge, Mr. Clay left a loan application from his bank at Mr. Lee’s house. Ms. Benton talked to personnel at the bank, but she did not qualify for a loan. Mr. Lee stated that Mr. Clay was concerned that the bank would not extend credit to Ms. Benton, but Mr. Lee and Mr. Clay discussed the fact that Ms. Benton had already obtained her money. Mr. Lee testified that Mr. Clay later told him that the Clays had purchased the entire property. Ms. Benton was then contacted and informed of the sale to the Clays, and her exclusion from the transaction.
Ms. Benton further testified that she went to Hudson Lane and talked to Mr. North. Mr. North told her he was under the impression that she could not afford the property and no longer wanted it. Mr. North immediately called Mr. Clay and asked him to come into the office to resolve the matter, but Mr. Clay refused.
Ms. Benton testified that she went to Mr. Clay’s house and confronted him. Mr. Clay asked her to just give him her check. Ms. Benton, of course, refused because she no longer trusted Mr. Clay. Mr. Clay also told Ms. Benton that his wife would not sign any more documents.
As noted by the trial court, Mr. Clay’s testimony was confusing and self-serving. He admitted that he and Ms. Benton agreed to buy the property together, but that he did not know why Ms. Benton did not appear at the closing. Mr. Clay said that he went to the bank to get a loan and he told the bank to call Hudson Lane. He claimed that someone at Hudson Lane said that Mr. Clay had to pay for the entire property.
|nMr. Clay testified that he did not have Ms. Benton’s telephone number and that Hudson Lane was responsible for contacting her despite the fact that only his ad *221 dress and contact information had been provided to Hudson Lane. Contrary to his position that Ms. Benton could not afford her part, he also testified that he thought that Ms. Benton had already taken her money to Hudson Lane. Mr. Clay contended that, if Ms. Benton had given him her money, or had taken her check to the bank, the bank would have given Ms. Benton her share of the land. Mr. Clay also inexplicably claimed that he left “his loan” open for six months and after that time, he decided that he would not allow Ms. Benton to obtain 1/2 of the property.
Mr. Clay’s confusing testimony was further impeached when he was confronted with an affidavit he executed in May 2008, which was contrary to his testimony at trial.
Ms. Tucker, the paralegal, was present at the auction and the closing. At the auction, Mr. Clay stated that he would be the contact person and Ms. Benton deferred to him. Ms. Tucker said that Mr. Clay later told her that Ms. Benton was not able to get financing for her share of the property and that he and his wife would buy all the land. Ms. Tucker denied that personnel at the bank initially told her that Ms. Benton was not going to purchase her share of the land. Ms. Tucker stated that on August 6, 2007, she talked to someone at the bank who also understood that Ms. Benton would not be purchasing the property. Among the closing documents was an assignment of rights in the Purchase and Sale Agreement from Ms. 112Benton to Mrs. Clay. That document was not executed before the closing, as the Clays indicated they would get it signed.
Mr. North testified that he did not remember talking to Ms. Benton or Mr. Clay prior to the closing. At closing, he gave the assignment of rights in the Purchase and Sale Agreement to the Clays, who told him it would not be a problem to get Ms. Benton to sign the document. After the closing, Ms. Benton came to his office and said that she had her money to purchase the property. Mr. North told Ms. Benton that the title company had been informed that she would not be involved in the closing. Mr. North called Mr. Clay in Ms. Benton’s presence and asked him to come to the office. According to Mr. North, Mr. Clay was not responsive and was noncommittal. Mr. North testified that he never heard from Mr. Clay after that conversation. Mr. North suggested to Ms. Benton that she seek legal counsel.
Mrs. Clay acknowledged that she knew that Ms. Benton and Mr. Clay had agreed to buy the property together. She said that prior to the closing, someone contacted Mr. Clay and told him to bring the entire purchase price to the closing. Mrs. Clay later said that Mr. Clay told her they had to pay the entire purchase price for the property. Mrs. Clay admitted that at the closing, she inquired as to Ms. Benton’s whereabouts, but did not receive an answer.
The trial court noted that Mr. Clay, the designated contact person with Hudson Lane, provided no credible explanation as to why he did not contact Ms. Benton to appear at the closing. The court observed that Mr. 11sClay had not taken any action to honor his agreement with Ms. Benton and did not even return her portion of the earnest money paid to bind the transaction.
The evidence accepted as credible by the trial court clearly establishes an agreement to buy the property jointly and that Mr. Clay was aware that Ms. Benton had the money in hand to complete the purchase. He knowingly and intentionally made misrepresentations to the title company and to the plaintiff. Mr. Clay’s self-serving testimony was nonsensical, inconsistent and contradictory, as noted by the *222 trial court in its reasons for judgment. His credibility was thoroughly impeached.
The trial court found Mr. Clay’s testimony not credible and rejected his contention that everyone else was lying. These findings are not manifestly erroneous or clearly wrong. The trial court correctly found that Mr. Clay knowingly and intentionally misrepresented to Hudson Lane that Ms. Benton was not able to obtain the funds and was not going forward with the transaction and that Mr. Clay acted in a fraudulent manner and in bad faith.
DETRIMENTAL RELIANCE AND SPECIFIC PERFORMANCE
The Clays assert that the trial court erred in ordering specific performance based upon detrimental reliance. They argue that, because the agreement to buy the property together was oral and not reduced to writing, the doctrine of detrimental reliance does not apply. As a preliminary matter, we note that the Clays have completely ignored the portion of the trial court ruling finding that the plaintiff proved a valid, binding agreement which 114was breached by Mr. Clay, thus entitling Ms. Benton to both specific performance and damages. See La. C.C. art.1986. As an alternative basis for recovery, the trial court also found that Ms. Benton had proven all the necessary elements for a claim based upon detrimental reliance. The Clays contend Ms. Benton is not entitled to specific performance because the property has undergone a transformation in value and nature such that it is essentially not the same property and is encumbered by their mortgage. All of these arguments are without merit.
Discussion
Although the trial court expressly found a valid, binding agreement, we will address the Clays’ arguments. La. C.C. art.1967 states:
Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
Detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one’s detriment because of the reliance. To prevail on a detrimental reliance claim, Louisiana law does not require proof of a formal, valid, and enforceable contract. Suire v. Lafayette City-Parish Consol. Gov’t, 2004-1459 (La.4/12/05), 907 So.2d 37; Allbritton v. Lincoln Health Syst., Inc., 45,537 (La.App. 2d Cir.10/20/10), 51 So.3d 91. This is because detrimental reliance is not based upon the intent to be bound. Rather, the basis of detrimental reliance is the idea that a person should not harm another person by making promises that he will not keep. Thus, the focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment. Suire v. Lafayette City-Parish Consol. *223 Gov’t, supra; Allbritton v. Lincoln Health Syst., Inc., supra.
La. C.C. art.1986 provides:
Upon an obligor’s failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the obligee so demands. If specific performance is impracticable, the court may allow damages to the obligee.
Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court.
Under Louisiana law, specific performance is the preferred remedy for breach of contract. An obligee enjoys the right to demand, insofar as is practicable, the specific performance of the obligation. Charter School of Pine Grove, Inc. v. St. Helena Parish School Bd., 2007-2288 (La.App. 1st Cir.2/19/09), 9 So.3d 209. An obligee has a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor’s interest, or of | ^substantial negative effect upon the interests of third parties. When specific performance is impracticable or when the court, in its discretion, refuses to grant specific performance of an obligation to do, the court may instead fix damages. Charter School of Pine Grove, Inc. v. St. Helena Parish School Bd., supra.
To prevail on a detrimental reliance claim, Ms. Benton was not required to prove a valid, enforceable contract.[5] However, as found by the trial court, she did prove a valid, enforceable contract. There is no dispute that Mr. Clay agreed with Ms. Benton to purchase the property together. Numerous documents were signed by Ms. Benton and Mr. Clay on June 28, 2007, which evidenced their agreement, as noted by the trial court. Ms. Benton justifiably relied on that promise and suffered a change to her detriment because of her reliance. Because of Mr. Clay’s promise, Ms. Benton did not bid on the property solely on her own behalf. Ms. Benton paid her share of the earnest money for the purchase and she withdrew $18,000 from her 401(k) retirement account to cover her portion of the purchase price. Mr. Clay harmed Ms. Benton by making a promise that he did not keep. Ms. Benton was deprived of an undivided 1/2 ownership interest in the property and receiving her share of the proceeds from the timber sales. Based on this record, Ms. Benton proved her claim for L detrimental reliance, in addition to the fact that she proved a valid and enforceable contract.
Furthermore, we reject the Clays’ arguments that the formalities required by La. C.C. art. 2440 are lacking in this case and preclude recovery. The agreement between Ms. Benton and Mr. Clay was not required to be in any particular written form. It was not a transfer of immovable property between Ms. Benton and Mr. Clay as contemplated by La. C.C. art. 1839, which provides in pertinent part:
A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, *224 an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.
Further, their agreement was not a sale or promise of sale of an immovable between Ms. Benton and Mr. Clay as governed by La. C.C. art. 2440, which states:
A sale or promise of sale of an immovable must be made by authentic act or by act under private signature, except as provided in Article 1839.
The parties began with an oral agreement to jointly bid on the property and secure the winning bid. They then memorialized their agreement to co-purchase the property when they jointly executed the Purchase and Sale Agreement with Plum Creek and other documents. Mr. Clay breached this obligation by failing to inform Ms. Benton of the date of the closing and purchasing the entire tract with his spouse. The Clays offered no credible evidence to support their claim that the property had so changed in value and nature that specific performance was not possible. 11sFurther, any changes to the property or encumbrances were caused by the arbitrary actions of the Clays. The trial court did not err in ordering specific performance of the agreement and ordering the Clays to do whatever was necessary to transfer an undivided 1/2 interest in the property to Ms. Benton free of any mortgages, liens, or other encumbrances.
DAMAGES AND ATTORNEY FEES
The Clays maintain the trial court erred in awarding damages and attorney fees to Ms. Benton. They claim that the only possible damage that Ms. Benton suffered was the loss of her earnest money. They urge that when the timber was sold from the property, the land legally belonged to them and they had the right to do whatever they wanted.
Discussion
The record clearly supports the trial court’s award of damages to Ms. Benton for 1/2 of the proceeds from the timber sales. Unfortunately, the record was devoid of sufficient proof to compensate Ms. Benton for the Clays’ dirt sales and storage revenue. Finally, we are constrained to find that the trial court erred in awarding attorney fees to Ms. Benton. La. C.C. art.1958 provides that a party against whom rescission is granted because of fraud is liable for damages and attorney fees. There was no rescission of a contract in this case and thus the provisions on contractual fraud contained in La. C.C. arts.1953-1958, to authorize an award of attorney fees, do not apply. See Boudreaux v. Jeff, supra.
11 ¡As set forth above, the trial court also found that Mr. Clay acted in bad faith. In connection with a bad faith breach of an obligation, La. C.C. art.1997 provides:
An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.
This article does not expressly authorize an award for attorney fees and under the jurisprudence, such an award cannot be made. Sher v. Lafayette Ins. Co., 2007-2441, 2007-2443 (La.4/8/08), 988 So.2d 186.
As a general rule, attorney fees are not allowed in Louisiana except where authorized by a particular statute or provided for by contract. An award of attorney fees is, in essence, a type of penalty. Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382; Deleon v. WSIS, Inc., 31,602 (La.App. 2d Cir.2/26/99), 728 So.2d 1046; Rutherford v. Impson, 366 So.2d 944 (La.App. 1st Cir. *225 1978), writ denied, 869 So.2d 140 (La.1979). They are not awarded to make the injured party whole, but rather to discourage a particular activity or activities on the part of the other party. Sharbono v. Steve Lang & Son Loggers, supra; Langley v. Petro Star Corp. of La., 2001-0198 (La.6/29/01), 792 So.2d 721.
In the present case, the plaintiff has not established that she was legally entitled to attorney fees by virtue of any statute or contract. Although the record is clear that Mr. Clay’s conduct was both fraudulent and in bad faith, current Louisiana law simply does not allow for an award of attorney fees. Therefore, we are constrained to find that the trial court 18nerred in making an award of attorney fees in this matter.[6] That portion of the trial court judgment is reversed.
INVOLUNTARY DISMISSAL
The Clays claim that the trial court erred in denying their motion for involuntary dismissal. This argument is without merit.
Discussion
La. C.C.P. art. 1672(B) provides:
B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
La. C.C.P. art. 1672 affords the trial judge discretion to render judgment or to decline to render any judgment until the close of all the evidence. The decision of a trial court denying a motion for involuntary dismissal at the close of the plaintiffs case leaves nothing to review on appeal. See Townsend v. Delchamps, Inc., 94-1511 (La.App. 1st Cir.10/6/95), 671 So.2d 513, writ denied, 95-2648 (La.1/12/96), 667 So.2d 522; Driggers v. Kroger Co., Inc., 29,431 (La.App. 2d Cir.4/4/97), 692 So.2d 1338; Riser v. American Med. Int'l, Inc., 620 So.2d 372 (La.App. 5th Cir.1993); Parker v. Winn-Dixie La., Inc., 615 So.2d 378 (La.App. 5th Cir.1993).
The trial court, in its discretion, denied the motion to dismiss made by the Clays and heard all the evidence presented in the matter before rendering its decision. As set forth above, under these circumstances, where the trial court has denied a motion for involuntary dismissal, there is nothing for review on appeal.
PRESCRIPTION
The Clays argue that the trial court erred in finding that their third party demand against Hudson Lane was barred by prescription. They urge that, in a claim for indemnification based on a tortious act, prescription begins to run when the indemnity claimant suffers the loss or damage. The Clays made a claim for indemnity or contribution against Hudson Lane and they argue that the prescriptive period for this claim did not begin to run until a *226 judgment was entered against them. This argument is without merit.
Discussion
The Clays’ argument reflects that they have both confused and commingled the legal concepts regarding their damage claims and their claim for indemnity or contribution against Hudson Lane. The Clays base their argument on appeal regarding prescription on prior law providing solidary liability for joint tortfeasors and specifying that the time limit for filing a claim for contribution and indemnity by one tortfeasor against another tortfeasor does not begin to run until the party seeking it is cast in judgment. See Bergeron v. Amerada Hess Corp., 478 So.2d 1308 (La.App. 5th Cir.1985). The trial court found that the Clays did not have a cause of action or a right of action against Hudson Lane for indemnity or contribution. In granting Hudson Lane’s exceptions regarding the claim for contribution or indemnity, the trial court correctly noted that Louisiana law regarding the liability of joint tortfeasors has changed. In 1996, the Louisiana legislature amended La. C. C arts. 2328 and 2324. The Louisiana Supreme Court found that this provision abolished solidarity between non-intentional tortfeasors and makes each non-intentional tortfeasor liable only for his own share of the fault, which must be quantified pursuant to La. C.C. art. 2323. Dumas v. State ex rel. Dept. of Culture, Recreation, & Tourism, 2002-0563 (La.10/15/02), 828 So.2d 530. Further, there was no indemnity contract between the Clays and Hudson Lane. Accordingly, the trial court correctly found that the Clays had no cause of action for contribution or indemnity. The Clays have not appealed that portion of the trial court judgment. With no cause of action for contribution or indemnity, the Clays’ argument that the time limit for this claim does not begin to run until the entry of judgment against them is inapposite.
In their third party demand, the Clays also asserted a claim for damages against Hudson Lane. They urged that Hudson Lane was at fault in failing to obtain an assignment from Ms. Benton before the closing, failing to contact Ms. Benton before closing, falsely informing Ms. Benton that the Clays said that Ms. Benton was out of the deal, and for other acts of fault and negligence. They sought damages for emotional distress, mental anguish and aggravation, court costs, attorney fees, and loss of income. The | atrial court correctly reasoned that these damage claims were based in legal malpractice or tort. Regarding the prescriptive period for legal malpractice, La. R.S. 9:5605 provides for one and three year periods.[7]
*227 The closing occurred on August 15, 2007. The Clays did not file their third party demand until February 7, 2011. The Clays’ claims for alleged legal malpractice were clearly prescribed and/or perempted.
The trial court also observed that, under La. C.C. art. 3492, the prescriptive period for fault or negligence claims is one year.[8] Any delictual claim the Clays may have had against Hudson Lane was also prescribed. 124The trial court did not err in finding that the Clays’ claims for damages, against Hudson Lane, however styled, had prescribed.
MOTION TO SEVER
The Clays assert that the trial court erred in granting a motion to sever their claims against Hudson Lane for indemnity or contribution from the claims in Ms. Benton’s main demand.[9] This argument is without merit.
Discussion
As set forth above, the trial court correctly found that the Clays did not have a cause of action against Hudson Lane for indemnity or contribution. This ruling renders moot any argument complaining of the granting of the motion to sever the Clays’ third party demand against Hudson Lane on this issue.
However, we observe that La. C.C.P. art. 1038 provides:
The court may order the separate trial of the principal and incidental actions, either on exceptions or on the merits; and after adjudicating the action first tried, shall retain jurisdiction for the adjudication of the other.
When the principal and incidental actions are tried separately, the court may render and sign separate judgments thereon. When in the interests of justice, the court may withhold the signing of the judgment on the action first tried until the signing of the judgment on the other.
The trial judge may order separate trial of the principal and incidental demands in an effort to avoid unnecessary delay. Herb’s Mach. Shop, Inc. v. John Mecom Co., 426 So.2d 762 (La.App. 3d Cir.1983), writ denied, 430 So.2d 98 (La.1983).
12sThe trial court granted Ms. Benton’s motion to sever because to do otherwise would have unnecessarily delayed the proceedings. The Clays did not file their third party demand timely and did not obtain the appropriate court authorization to file their pleading. Hudson Lane then filed numerous exceptions which could not be addressed before the trial date. In December 2010, a scheduling order was filed which set a priority trial date in May *228 2011, more than three years after the filing of the suit. The trial court acted within its discretion in granting the motion to sever.
CONCLUSION
For the reasons stated above, we affirm those portions of the trial court judgments awarding specific performance and damages to Ms. Benton and dismissing the third party demands by the Clays against Hudson Lane.
We are constrained to reverse that portion of the trial court judgment granting attorney fees to Ms. Benton in the amount of $8,300. Costs in this court are assessed against the defendants, Calvin Clay, Sr., and Bessie Clay.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.

. The check issued to Ms. Benton by Fidelity Investments actually reflects a taxable distribution in the gross amount of $22,500, with $4,500 deducted for federal tax, leaving a net amount of $18,000 paid to Ms. Benton.

. The testimony indicated that the majority of the timber money was turned over to Marion State Bank by the Clays to pay on their loan.

. Rather than a cross claim, the demand against Hudson Lane should have been labeled a third party demand. Hudson Lane was not a party to this suit.

. Other exceptions included improper cumu-lation of actions, improper venue, no right of action for attorney fees, res judicata, and vagueness. These exceptions are not before the court for consideration in this appeal.

. Mr. Clay contends that, because the agreement to buy the property jointly with Ms. Benton was not written, the doctrine of detrimental reliance does not apply, citing Morris v. Friedman, 94-2808 (La.11/27/95), 663 So.2d 19. However, since the enactment of La. C.C. art. 1967, Louisiana courts have found detrimental reliance to occur despite the fact that an onerous contract may lack a requisite formality such as written execution in authentic form, provided that the requisites of La. C.C. art. 1967 are satisfied. See Dugas v. Guillory, 97-398 (La.App. 3d Cir. 10/7/98), 719 So.2d 719.

. Ms. Benton urges in her brief that the $8,300 attorney fee award could be "recast” as damages by this court. We are unable to do this. We note it is inequitable that a party can be awarded attorney fees when a contract is rescinded on the basis of fraud (see La. C.C. art. 195 8), but a party who breaches an obligation in bad faith and in a fraudulent manner escapes liability for attorney fees. This is a matter that should be addressed by the legislature.

. La. R.S. 9:5605 provides in part:
A. No action for damages against any attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of this state to engage in the practice of law, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide legal services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered; however, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.
B. ... The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article *227 3461, may not be renounced, interrupted, or suspended.
C. Notwithstanding any other law to the contrary, in all actions brought in this state against any attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional law corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of this state to engage in the practice of law, the prescriptive and peremptive period shall be governed exclusively by this Section.
[[Image here]]
E. The peremptive period provided in Subsection A of this Section shall not apply in cases of fraud, as defined in Civil Code Article 1953.

. La. C.C. art. 3492 provides in pertinent part:
Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained.

. The Clays’ brief complains that the motion to sever was filed by Hudson Lane. This is incorrect. The motion to sever was filed by Ms. Benton.