Judgment rendered November 15, 2023.
Application for rehearing may be filed within the delay allowed by Art. 2166, La. C.C.P.

No. 55,317-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

RYAN CHMIELEWSKI AND                    Plaintiffs-Appellees
PATRICIA CHMIELEWSKI

versus

DEREK SOWELL,                           Defendants-Appellants
INDIVIDUALLY AND ON
BEHALF OF PROSPECTIVE REAL
ESTATE, LLC OF COLORADO,
AND SHREVEPORT
INVESTMENT GROUP, LLC,
D/B/A KELLER WILLIAMS
REALTY NWLA

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 617,326

Honorable Michael A. Pitman, Judge

* * * * *

COOK, YANCY, KING & GALLOWAY APLC        Counsel for Appellant,
By: Bernard S. Johnson                    Derek Sowell, Individually
                                          And on Behalf of
                                          Prospective Real Estate,
                                          LLC of Colorado

BREAZEALE, SACHSE & WILSON, LLP           Counsel for Appellant,
By: Eric B. Landry                        Louisiana Realtors
    Kristin E. Oglesby

KAMMER & HUCKABAY, LTD APLC               Counsel for Appellees
By: Charles H. Kammer, III

* * * * *

Before COX, STEPHENS, and ROBINSON, JJ.

**COX, J.**

This appeal arises out of the First Judicial District Court, Caddo Parish, Louisiana. Ryan and Patricia Chmielewski (hereinafter referred to as the "Plaintiffs") filed suit against Derek Sowell ("Capt. Sowell") and Prospective Real Estate, LLC of Colorado ("Prospective Real Estate") (collectively referred to as the "Defendants")[1] for misrepresenting property repairs in their real estate transaction. The trial court found that Capt. Sowell was liable as the agent but not liable as the seller. Capt. Sowell has appealed that ruling, the Plaintiffs answered the appeal, and Louisiana Realtors filed an *amicus curiae* brief. For the following reasons, we affirm the trial court.

## FACTS

On July 26, 2018, the Plaintiffs purchased property at 4057 Baltimore Avenue in Shreveport (the "Property") through a cash sale deed from Prospective Real Estate. The home on the Property is a two-story house; the first floor is on the ground level of the front yard; the second level is a basement that cannot be seen from the front, but is at ground level from the back yard; there are walls under the ground that form the basement level. Capt. Sowell was the agent/owner and sole member of Prospective Real Estate. Capt. Sowell was also the real estate agent for the Property. The Plaintiffs purchased the Property "as is" with the following waiver:

> SALE AS IS WITHOUT WARRANTIES: Vendor and Vendee hereby acknowledge and recognize that the Property being sold and purchased is to be transferred in as is condition and further Vendee does hereby waive, relieve and release Vendor from any claims or causes of action for redhibition pursuant to Louisiana Civil Code Article 2520, et seq. and Article 2541, et

---

[1] Shreveport Investment Group, LLC d/b/a Keller Williams Realty NWLA was originally named in the suit and later dismissed.

seq. or for reduction of Sales Price pursuant to Louisiana Civil Code Article 2541, et seq. Additionally, Vendee acknowledges that this sale is made without warranty of fitness for ordinary or particular use pursuant to Louisiana Civil Code.

Prior to the purchase, on June 30, 2018, Capt. Sowell signed a property disclosure document (hereinafter referred to as the "Disclosure") and the Plaintiffs signed the Disclosure on July 3 and 4, 2018. He marked "yes" beside the following statement: "Has any flooding, water intrusion, accumulation, or drainage problem been experienced with respect to the land?" He then wrote the following on the Disclosure: "There was a water intrusion problem before remodel. Ark-La-Tex Foundations excavated the entire perimeter of the home, applied waterproofing, and a new tile drain. The repair was signed off by a professional engineer. Ark-La-Tex provided a 3-year warranty." Capt. Sowell disclosed that there had been foundation repair—it was waterproofed and a certified contractor inspected the foundation and determined no repairs were required. He stated the Property experienced damage from windstorm, flood, hail, or lightning, which was repaired.

On June 18, 2019, the Plaintiffs filed their original petition against the Defendants. They alleged that prior to buying the Property, the water intrusion was not apparent, discoverable, or obvious because the defects were hidden. They stated that they experienced water damage on November 12, 2018, December 27, 2018, and May 9, 2019. The Plaintiffs asserted that when investigating the water intrusion, they discovered that Capt. Sowell never fixed the problem as set forth in the disclosure because he was still working on the flooding issues in 2017 and 2018. They alleged that Capt. Sowell, as agent of Prospective Real Estate, fraudulently misrepresented that

2

the Property had been repaired and the flooding issue had been resolved. They asserted that Capt. Sowell intentionally and fraudulently failed to disclose the issues on the Property and numerous repair attempts after the 2016 engineering report. The Plaintiffs alleged that Capt. Sowell breached his ethical duties as an agent because he had the duty to relay accurate information about the Property.

The Plaintiffs stated that because the Defendants fraudulently misrepresented the Property, they are not bound by the waiver of warranty and "as is" clause. They stated that had they known of the defects or continuous efforts to fix the problem, they would not have purchased the Property. The Plaintiffs alleged that they have been forced to tear apart their home; they have been displaced as a result of the repair work; they have expended a substantial amount of time, money, and energy in discovering the fraudulent misrepresentations made by Defendants; and, they have expended and will continue to spend a substantial amount of time, energy, and money on repairing the Property. The Plaintiffs alleged that they have suffered stress, mental anguish, inconvenience, and loss of enjoyment of the Property. They stated that they have had significant concerns regarding the effect on their health and quality of air due to the improper management of water intrusion remediation; they were concerned that they may lose their home.

The Plaintiffs requested the following from the Defendants: return of the purchase price with interest from the time it was paid; reimbursement of reasonable expenses occasioned by the sale and those incurred for the preservation of the house; and, damages, costs, and reasonable attorney fees. In the event that the sale was not rescinded, the Plaintiffs requested a

reduction in the sale price along with all damages, costs, and attorney fees as allowed by law.

The Defendants filed an answer and then two amended answers, which all denied the Plaintiffs' allegations and stated that the Plaintiffs caused and/or contributed to water intrusion problems on the Property by failing to maintain the premises in the following ways:

a) Damaging the waterproofing system in the course of performing yard maintenance or otherwise;

b) Permitting damaged components of the waterproofing system to remain in a damaged condition, and failing and refusing to repair them, even though the damaged sections are obviously the source of water intrusion into the house;

c) Failing to properly maintain the drainage system around the front porch of the house, allowing the intake to the drainage system there to extend well above the surface level, making it impossible for water to drain through it;

d) Failing to remedy the settling of the front porch slab, which has become tilted in the direction of the house, causing water to pool near the house;

e) Other acts and omissions to be shown at the trial of this case;

f) Allowing water from the west side of the property to pool against the house, by failing to divert water from the front of the house to the sides;

g) Failing to address the settling of the soil resulting in the separation of the drainage blanket from the foundation wall.

The Defendants alleged that for these reasons, the damage was caused by the Plaintiffs and the Plaintiffs' failure to mitigate their damage. They stated that the Plaintiffs specifically waived any redhibition and had the full opportunity to inspect the house before the sale. They also argued that the Plaintiffs were not entitled to set aside their waiver of redhibition because they could have ascertained the facts that they claim were suppressed "without difficulty, inconvenience, or special skill." They asserted that if

4

the Plaintiffs are permitted to claim redhibition, then they (the Defendants) are entitled to a credit for the Plaintiffs' use of the house from July of 2018, as provided in La. C.C. art. 2545.

The Defendants asserted that drainage repair was completed by Ark-La-Tex Foundation Services. They stated that if the Plaintiffs suffered any damages resulting from inferior materials or defective workmanship, which result in any liability to the Defendants, then they (the Defendants) are entitled to indemnification against Ark-La-Tex Foundation Services.

The Defendants filed a motion for summary judgment on the basis that the Plaintiffs could not seek to rescind the sale of the Property for redhibitory defects because the sale was made "as is, where is" with an explicit waiver of redhibition. The Plaintiffs opposed the MSJ and a hearing was held on October 4, 2021. The trial court found there were genuine issues of material fact and denied the Defendants' MSJ. The Defendants took a writ to the Fourth Circuit, which was denied.[2]

After the pretrial order, witness list, and exhibit list were filed, the Defendants filed a submission of the evidentiary deposition of John Wells. They asserted that this testimony was offered concerning a credit for the Plaintiffs' use of the allegedly defective residence, in the event the trial court determined that they had any liability to the Defendants on the basis of redhibition.

The trial was held on June 22 and 23, 2023. Rebecca Stevens testified that she has been a licensed real estate agent for 20 years and licensed real

---

[2] At the time the writ was taken, all nine judges of this Court were recused because Bernard Johnson, the Defendants' attorney, was representing the Court in an unrelated matter. He is no longer representing this Court so the recusal no longer applies.

estate broker since 2015. Mrs. Stevens has additional certifications in real estate including being a military specialist. She stated that she is typically involved in 70 to 90 home-purchase transactions a year and represented the Plaintiffs in their purchase from the Defendants. She testified that there were no disclosures attached to the real estate listing of the Property so she requested them in the buy/sell agreement on June 27, 2018. She stated that she initially received disclosures dated August 9, 2017, and requested an updated disclosure for 2018, the year of the purchase.

Mrs. Stevens testified that the Plaintiffs had the home inspected. She explained that home inspectors are licensed and look at "plumbing, heating, the roof on the home, make sure we don't have any blown shingles. Anything that would persuade further investigations." She then read the disclosures regarding the waterproofing of the foundation and water intrusion. She stated that because of the issues on the 2017 disclosure, she requested an updated disclosure to determine if there had been any more water intrusion. Mrs. Stevens testified that it is the seller, not the agent, who fills out the disclosure form. She testified that when they received the Disclosure, it stated the water intrusion had been fixed and signed off by an engineer. Mrs. Stevens stated that they requested and received the engineer's letter, which was signed December 5, 2016.

Mrs. Stevens stated that based on the information from the disclosures and engineer's letter, they believed the water intrusion problem had been fixed. Because of the information in the disclosures and home inspections, she believed the house to be sound and a good deal. She testified that had the Disclosure included that there had been water intrusions in December of 2017 or February, March, and April of 2018, she would have been unsure if

6

there was a continuing issue and does not believe her clients would have purchased the home.

On cross-examination, Mrs. Stevens stated that as far as she knew, the Plaintiffs signed the purchase agreement before reading any disclosure document. She testified that she did not discuss with the Plaintiffs that the Disclosure could not be used as a substitute for any warranties that they could obtain. Mrs. Stevens testified that Capt. Sowell did not properly fill out the Disclosure because he did not write in the frequency of the water intrusion. When questioned whether she ever asked about the frequency of water intrusion, she stated that she did not.

Capt. Sowell testified that he wanted to completely repair the Property. He stated that based on a report from the first engineer, he wanted to do the "superior solution" recommended, but that engineer said he could not do it because there was a liability if something went wrong. Capt. Sowell testified he found another engineer, Carl Smoak, who agreed with the "superior solution" and drew up a plan. Capt. Sowell contacted Interstate Foundation to assess the foundation and any structural issues; Interstate Foundation said there were no issues and provided a report to Capt. Sowell, which he provided to the Plaintiffs.

Capt. Sowell testified that the last water intrusion date was February of 2018. He stated that after they did the initial waterproofing and before the final repairs, the water only came into the basement during heavy rains. He stated there would be about an eighth of an inch of water over a third of the living room and some water in the bedroom. He stated that mops and a shop vac would be used to clean up the water.

7

Capt. Sowell testified that in order to address the water intrusion problem, he hired a professional engineer and multiple foundation repair and water intrusion experts. He stated that the engineer concluded that the tile drain on the base of the foundation was either no longer functioning or did not exist—the only way to repair the Property fully and correctly would be to do a complete excavation, waterproof the exterior, and install a new tile drain.

Capt. Sowell testified that he dug a trench all the way from the ground level to the bottom of the house, applied waterproofing to the house, and then filled in the trench. He also stated that he performed some regrading of the Property to push water away from the house. Capt. Sowell stated that he thought the problem was resolved because there was no water intrusion for a year, but in December of 2017, water again leaked into the basement. Capt. Sowell testified that they moved a gutter that was depositing water into a back flowerbed, where there was no waterproofing. He stated that he talked to his engineer and foundation guy again and they thought it could be hydrostatic pressure coming up from the floor so they installed a sump pump. There was another water intrusion event after the sump pump was placed. Capt. Sowell was then advised that the issue was surface water flooding the front yard and overcoming the waterproofing because waterproofing is not a levee. It was then recommended that he put in surface drains to remove water from the front of the house. He stated that after the drains were installed, his contractor checked on the house after every rain and there was no water intrusion. Capt. Sowell testified that he believed the water intrusion problem was resolved.

8

Capt. Sowell admitted that he did not include the dates of flooding or frequency on the Disclosure. He read the following email he sent to his contractor and Mr. Smoak on February 24, 2018:

> Hey guys, what is your assessment of Baltimore? As you can imagine, the flooding is causing damage, and more importantly, I cannot sell a house with a water intrusion problem. We put a sump pump in because we thought it might have been hydrostatic pressure pushing water up through the slab somehow, because the water is pooling in the center of the floor. That didn't solve the problem. I had someone in the basement soaking up the water with a shop vac as it came in. It was coming through the front wall, primarily southwest corner. The water just drains the same, because the floor slopes that way. It seems like the original problem still exist. It seems like the water is penetrating the cold joint between the slab and the concrete wall. This is happening in heavy rains. Shouldn't the Delta joint prevent any water from reaching the cold joint. How is the water getting behind the wall with waterproofing? I assume the way the water escapes the tile drain is being exceeded by the rate the water is coming in, but shouldn't the waterproofing prevent the water penetration?

Capt. Sowell explained that the waterproofing is not like a levee, but it is supposed to bring the water down to the bottom and have it come out of a drain. The problem with this house is that the water was not draining and was pooling against the side of the house. In order to remedy that problem, Capt. Sowell and his professionals installed six or more pickups, which are drains about 10 inches in diameter that have an open hole so that any surface water will drain into it and out of the pipe. He stated that he was assured that the waterproofing was fine and the problem was the draining.

Don Durr, Jr., a civil engineer, stated that he became involved in the Property when Mrs. Chmielewski called him with complaints of water intrusion in the basement. He recalled seeing work done on the house between 2016 and 2018 when he was in the neighborhood working on another project. Mr. Durr stated that based on his initial assessment of the

9

house, the excavation and drainage work previously performed did not work. He stated that he reviewed photographs of the previous work and noticed that the drainage barrier did not look as though it extended to the bottom of the wall to seal it and there was also some concern about the drainage blanket having some waves and not being flat against the wall. He stated that if the drainage blanket was not completely flat, water could breach it and get to the house. He stated that the sump pump did not work because it was installed downstream from the water but would not have fixed the water intrusion problem in this situation anyway because the water was building up behind the wall and not coming through the floor.

Mr. Durr stated that he recommended that the Plaintiffs excavate down to the bottom of the wall on all three sides, remove the drains, and reinstall the drains and drainage blanket. He believed this would be a redo of the 2016 excavation project. He testified that the cold joint did not appear to be sealed from the pictures because the drainage blanket stopped at the top of the footing, which allowed any water to build up and seep through the cold joint, into the wall, and into the interior of the house. In his second recommendation, he told the Plaintiffs that the front porch needed to be redone because it had settled and was sloping toward the house, which would allow water to pool up against the house. He stated that he also recommended a swale to divert the water away from the house, but it would not be a permanent fix. He described a swale as a ditch and slopes that direct water away from the house. While investigating the drainage in the yard, he discovered that an underground drainage pipe had been crushed by the installation of a fence, which restricted water flow.

10

Mr. Durr stated that they installed the swale but did not excavate and fix the drainage blanket. He stated that there had been no reports of a water intrusion since the swale was completed in November of 2020. He testified that it was his opinion that if there was a heavy amount of water next to the house, they would experience water intrusion.

On cross-examination, Mr. Durr admitted that the picture of the drainage blanket, which is also called a delta drain, that he reviewed was taken before the pipe was laid so the pipe could not have been wrapped yet. He stated that in May or June of 2019, he began to see some separation of the caulking, and in January of 2020, he noticed the settling of the front porch, which would be a significant source of water infiltration. He agreed that water ponding in the flowerbeds was a source of water intrusion as well. He also agreed that the damaged delta drain at the surface of the flowerbed could have been a source of water intrusion. He stated that he did not know all the sources of the water intrusion. Mr. Durr stated that Mr. Smoak's design to address the protection of the walls was adequate. He also admitted to not observing the cold joint.

Mr. Smoak testified that he is familiar with the Property and was called to determine methods which would prevent water intrusion. He stated that in November of 2016, he made a recommendation to apply a mastic sealer on the outside of the exterior wall, cover with a drainage blanket, install a perforated pipe at the bottom of the wall in a trench, and backfill the trench with stone. He testified that the workers made the following deviation during the installation: instead of putting the stone backfill in the trench, they backfilled it with the excavated material. He stated that the

11

stone would have provided a drainage channel for the water to drain into the pipe at the bottom of the trench.

Mr. Smoak testified that the letter he wrote on December 5, 2016, was not a final approval that the work was done correctly, but a "snapshot" of the completed recommended items. He stated that when there was more water intrusion after the first project was completed, he did not recommend a sump pump but recommended that the water be drained away from the house to prevent it from pooling against the wall of the house. He testified that if the smashed pipe was mashed so that water could not get through at all, it would stop the water from draining away from that area, and the water would pool around the pipe. Mr. Smoak stated that he believed the surface water was pooling next to the house and then running down the wall and leaking into the basement. He stated that because the soil around the home was clay, he did not believe the water was coming through the soil into the foundation.

The trial court questioned Mr. Smoak regarding the letter he wrote on December 5, 2016. He stated that the letter was intended for Capt. Sowell to explain that the work had been performed. On cross-examination, Mr. Smoak stated that Capt. Sowell never asked him to cut corners in his design and there were other remedies that Capt. Sowell could have tried first that would have been less expensive. Mr. Smoak agreed that the installation of the surface drains in the front yard would be a reasonable method to fix the ponding of water against the house. Regarding the drains installed in the front yard in 2018, Mr. Smoak was asked, "And if, after taking that step, [Capt.] Sowell checked and ascertained that there had been no more water intrusion events after he did that, would it [have] been reasonable for him to believe that he had solved the problem at that point?" Mr. Smoak replied, "I

12

think it's reasonable." Mr. Smoak agreed that when he observed the Property in the Fall of 2019, the porch had settled and created a gap between the porch and the wall, the delta drain had been damaged at the top, and a drainage inlet had floated above the surface, all of which could have affected the water intrusion.

Mrs. Chmielewski testified that she reviewed the Disclosure and noticed the water intrusion issues. She stated that based on the Disclosure and engineer's letter, she believed there was a water intrusion problem that had been fixed and there had not been any intrusion issues since December of 2016, when the letter was written. Mrs. Chmielewski stated that she and her husband decided to have the "routine" inspection performed on the house, which included checking the light switches, garage door, faucets, toilets, and heating and air conditioning units to make sure everything was functioning properly. When questioned why she did not have an inspection for water intrusion, she stated:

> I had no reason to believe there was a water intrusion problem beyond December 5th of 2016. I had documentation that said, there had been a problem when the home was purchased, it was professionally fixed and signed off by a professional engineer, so I had - -and the date on that was December 5th of 2016. So I had absolutely no reason to pursue further investigation.

Mrs. Chmielewski testified that she would not have purchased the home if she had been aware of the frequency of the water intrusion into the home. She stated that their first water intrusion event was on November 11, 2018. She testified that they cleaned up the water and she called Mr. Smoak on December 6, 2018, because his name was on the engineering letter they received with the Disclosure. She stated that Mr. Smoak informed her that he had seen a water intrusion in the home in February of 2018 and that was

the first time she was aware of any water intrusions after December of 2016. She testified that they experienced more water intrusions on December 27, 2018, May 9, 2019, and January, February, and April of 2020.

Mrs. Chmielewski stated that they met with Mr. Smoak at the Property on December 11, 2018. She testified that they have spent money testing the air quality of their home, removing sheetrock, checking for asbestos when the sheetrock was removed, installing new gutters, hiring a land surveyor for the swale, constructing the swale, and hiring all the professionals to perform the different tasks. She testified that when the sheetrock was removed, they found what looked like mold in the downstairs bedroom. She described pictures and videos of the water intrusion and work progress and stated all the work on the swale was completed and the sheetrock reinstalled by August 10, 2021. Mrs. Chmielewski testified that they spent $51,805.56 to prevent the water intrusion. She requested that the trial court rescind the sale and order Capt. Sowell to reimburse them for their costs.

On cross-examination, Mrs. Chmielewski agreed that she had the opportunity to ask questions about the house prior to purchasing but declined to do so, even though she was aware of the house being completely remodeled. She stated she was not aware of any problems with the porch settling and causing a gap before purchasing the Property. She stated that her husband has caulked over the gap, which has gotten wider over time. Mrs. Chmielewski admitted that she had not received any untrue information from Capt. Sowell, except the alleged defective Disclosure. She then answered yes to the following question, "And you recognize, don't you, that Mr. Sowell, Captain Sowell, could have believed that the problem causing

14

the water intrusion in February of 2018 had been resolved by that additional work?" Mrs. Chmielewski also admitted that the first money she spent on the water intrusion problem was hiring an attorney and the first time Capt. Sowell was notified of a problem was when he was served with this lawsuit. The trial court questioned Mrs. Chmielewski as to why she felt she had been lied to if she agreed that it was reasonable for the seller to think he fixed the problem when he installed the drains. She responded that she felt she had been lied to because Capt. Sowell chose not mention the water intrusions after the initial repairs to remedy the issue.

Lieutenant Colonel Chmielewski testified that even though the frequency of water intrusion was left off the Disclosure, he felt they got a "better" answer because the Disclosure revealed that the water intrusion was professionally repaired and signed off by an engineer. He stated that he heard discussions about the "big dig" during closing; therefore, he asked Capt. Sowell if it was fixed, and Capt. Sowell stated that it was. Lt. Col. Chmielewski stated he got a "warm fuzzy" feeling when Capt. Sowell showed up at the house before the purchase wearing his service uniform. After the water intrusions, Lt. Col. Chmielewski now believes Capt. Sowell "withheld the fact that the big dig didn't work, and he gave us the disclosure and the letter to kind of sell the fact that it was fixed." He testified that he would not have purchased the home had he known the last water intrusion was months before the sale and the big dig did not work.

On cross-examination, Lt. Col. Chmielewski was asked why he did not question the frequency of the water intrusions in the Disclosure if he was expecting the see the frequency written out. He responded, "I did not ask. I was convinced that it was zero because it wasn't in there. And he had

mentioned it was there when he purchased it." When asked if Capt. Sowell's failure to disclose the water intrusion from 2018 could have been negligence instead of fraud, Lt. Col. Chmielewski answered, "What's the difference?"

Lt. Col. Chmielewski stated that after the suit was filed, Capt. Sowell offered for him and his contractor to redo the dig at no cost. In response to that offer, Lt. Col. Chmielewski stated that they gave a counter offer of redoing the big dig project, redoing the front porch, and making no-interest payments to reimburse them $51,000. Lt. Col. Chmielewski stated that Capt. Sowell did not accept this offer. He stated that he believes they have spent at least $80,000 on repair work.

Capt. Sowell was called to testify again. He testified that on March 28 and 29, 2018, Shreveport received 4 1/2 inches of rain, and the house did not have any water intrusion. He stated that on April 4 and 7, a day in May, and a day in June of 2018, Shreveport received between 1 1/2 and 2 1/2 inches of rain per day and there was no water intrusion in the house. He stated the March 28 and 29 rain event "was very telling, because that was such a huge amount of rain. We knew that the fix would-- like it did, in fact, fix the problem." He testified that he was confident that the water intrusion problem had been resolved. Capt. Sowell stated that if he had known the Plaintiffs experienced a water intrusion problem in November of 2018, he would have responded and sought to fix the issue. He stated that he did not make a profit on this house and lost money on the project.

When questioned on cross-examination whether he thought he would have problems selling the house if he listed the water intrusions in 2017 and 2018, Capt. Sowell stated that he did not think that would cause a problem in

16

selling the house. He stated, "I think I would explain exactly what happened, so there was, we had intrusions, we put in additional drainage, you can talk to the engineer. We had all these events of water coming into the property, and it was dry."

On August 12, 2022, the trial court filed its opinion ruling in favor of the Plaintiffs in the amount of $51,805.56 plus interest and court costs. As to the redhibition and fraud claims, the trial court found that Capt. Sowell omitted the frequency of the water intrusions. The trial court stated the less clear issue was whether Capt. Sowell completed the Disclosure with "intent to obtain an unjust advantage or to cause damage or inconvenience." The trial court found Capt. Sowell to be credible and he "had a sincere, albeit mistaken, belief that the water intrusion problem was resolved." The trial court found that any omissions or misrepresentations made by Capt. Sowell in the Disclosure were not made with the intent to obtain an unjust advantage or cause damage or inconvenience to the Plaintiffs. Therefore, the trial court found in favor of the Defendants on the redhibition, fraud, misrepresentation, and detrimental reliance claims. However, the trial court found in favor of the Plaintiffs on the agent liability and negligent misrepresentation claims, stating, "[A]s the selling agent in the subject transaction, Capt. Sowell had a duty to provide the Plaintiffs with true and accurate information regarding the house they intended to purchase." The trial court awarded the Plaintiffs $51,805.56 in damages, plus judicial interest and court costs, in accordance with the Plaintiffs' estimate of the costs of repairs. The judgment was signed on September 2, 2022. Both parties appeal the trial court's judgment, and Louisiana Realtors filed an *amicus curiae* brief.

17

## DISCUSSION

*Liability as Seller*

The Plaintiffs assert that the trial court erred in not finding fraud, redhibition, fraud in the inducement of a contract to support a waiver of warranty, and intentional misrepresentation as opposed to merely negligent misrepresentation. They request that this Court reverse the trial court's findings and award damages.

The standard of review in cases regarding findings of fact is manifest error. In order to reverse the factfinder's determination of fact, the reviewing court must review the entire record and find that a reasonable factual basis does not exist for the finding and determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. *Detraz v. Lee*, 05-1263 (La. 1/17/07), 950 So. 2d 557; *Bailey v. Delacruz*, 49,032 (La. App. 2 Cir. 6/16/14), 143 So. 3d 1220. When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error or clearly wrong standard demands great deference to the findings, for only the factfinder is cognizant of the variations in demeanor and tone of voice that bear on the listener's understanding of what is said. *Murray v. Bostwick*, 52,802 (La. App. 2 Cir. 8/14/19), 276 So. 3d 1120.

Louisiana's Residential Property Disclosure Act, La. R.S. 9:3196 *et seq*., requires the seller of real estate to complete a property disclosure document. The seller shall complete the property disclosure document in good faith to the best of the seller's belief and knowledge as of the date the disclosure is completed and signed by the seller. La. R.S. 9:3198(B)(1).

18

This disclosure document is not a warranty by the seller. La. R.S. 9:3198(D). La. R.S. 9:3198(E) states:

> A seller shall not be liable for any error, inaccuracy, or omission of any information required to be delivered to the purchaser in a property disclosure document if either of the following conditions exists:
>
> (1) The error, inaccuracy, or omission *was not a willful misrepresentation according to the best of the seller's information, knowledge, and belief*.
>
> (2) The error, inaccuracy, or omission was based on information provided by a public body or by another person with a professional license or special knowledge who provided a written or oral report or opinion that the seller reasonably believed to be correct and which was transmitted by the seller to the purchaser. (emphasis added).

The seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520. A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale. *Id*. A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price. *Id.*

Fraud in the inducement of a contract cannot be waived. *Shelton v. Standard/700 Associates*, 01-0587 (La. 10/16/01), 798 So. 2d 60. It is clear that a seller warrants his buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520. It is equally clear, however, that this warranty may be excluded or limited per La. C.C. art. 2548. Under this article, an otherwise effective exclusion or limitation of the warranty against

redhibitory defects is not effective if the seller commits fraud, as defined in the civil code, upon the buyer. Thus, although the warranty against redhibitory defects may be excluded or limited, a seller cannot contract against his own fraud and relieve himself of liability to fraudulently induced buyers. *Shelton v. Standard/700 Associates, supra*.

In sum, there are three basic elements to an action for fraud against a party to a contract: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract. *Id.*

Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La. C.C. art. 1953. The trial court's findings with respect to a claim of fraud are subject to the manifest error standard of review. *Benton v. Clay*, 48,245 (La. App. 2 Cir. 8/7/13), 123 So. 3d 212.

The elements of a claim for intentional misrepresentation are: (1) a misrepresentation of a material fact; (2) made with the intent to deceive; and (3) causing justifiable reliance with resultant injury. *Murray v. Bostwick, supra.*

The trial court wrote detailed reasons for its ruling. It stated that Capt. Sowell omitted the dates of flooding and that the 2016 remedy did not fix the water intrusion issue. However, the reason for the rulings in favor of Capt. Sowell, as seller, came down to a credibility call. The trial court had

to determine whether Capt. Sowell had the requisite intent to obtain an unjust advantage, deceive, or make a willful misrepresentation.

The trial court stated that it found Capt. Sowell's testimony to be credible. It stated, "Capt. Sowell had a sincere, albeit mistaken, belief that the water intrusion problem was resolved." The trial court highlighted Mr. Smoak's testimony that Capt. Sowell's belief was reasonable. It also noted that Mrs. Chmielewski recognized that Capt. Sowell could have believed the water intrusion problems had been resolved. For these reasons, the trial court found Capt. Sowell did not have an intent to obtain an unjust advantage, deceive, or make a willful misrepresentation. Therefore, the Plaintiffs' claims for redhibition, fraud, and willful misrepresentation were rejected.

It is well settled in Louisiana that trial courts are afforded great deference in making credibility calls. The trial court was in the best position to evaluate the tone and demeanor of the witnesses as they testified. After reviewing the record as a whole, we do not find this credibility call to be manifestly erroneous. Capt. Sowell testified that he believed the last installation of drains fixed the water intrusion problem because there were no more problems after some heavy rains came through. Although the last repair was done during an arguably drier season in Louisiana, weather records indicated Shreveport had received over four inches of rain at one point. As the trial court noted, Mrs. Chmielewski and Mr. Smoak recognized that it was reasonable for Capt. Sowell to believe the problems had been resolved. Although the Plaintiffs presented emails and text messages from Capt. Sowell during the repairs, these messages do not prove that Capt. Sowell had any ill intent to deceive or obtain an unjust advantage.

21

For these reasons, we do not find the trial court was manifestly erroneous in its factual determination that Capt. Sowell did not have the requisite intent to deceive, obtain an unjust advantage, or make a willful misrepresentation. These arguments lack merit. Because we affirm the trial court on this issue, we do not reach the issue of awarding additional damages.

*Liability as Real Estate Agent*

Capt. Sowell argues that the trial court erred in holding the agent to a higher duty of disclosure than the seller himself. He questions if he can be held liable for negligent misrepresentation as an agent if the trial court already determined he had a reasonable and sincere belief as the seller that the existing defect was effectively repaired. Capt. Sowell asserts that Louisiana law does not impose a higher duty on the seller's agent than it does upon the seller itself. He states that the trial court committed an error of law in basing its judgment upon the mistaken belief that the agent owes a higher duty of disclosure than the seller himself.

Louisiana Realtors filed an *amicus curiae* brief in support of Capt. Sowell, arguing no Louisiana Court has ever held that a selling real estate agent has a higher duty of disclosure than the seller. It asserts that under the statutory scheme, a licensed real estate agent is only liable for providing false information if he had actual knowledge of such. It argues that although Capt. Sowell was acting in a dual capacity, there is no basis for imposing a higher duty on him because he is subject only to 1) an "actual knowledge" standard as defined in the property disclosure form in his capacity as the seller, and 2) the "actual knowledge" standard as defined in La. R.S. 9:3198(B), which is the negligent misrepresentation framework.

Because this matter involves the interpretation of a statute, it is a question of law, and is thus reviewed by this Court under a de novo standard of review. *Thibodeaux v. Donnell*, 08-2436 (La. 5/5/09), 9 So. 3d 120.

A buyer's remedy against a real estate agent is not in redhibition but is based in fraud and negligent misrepresentation. *Bailey v. Delacruz*, *supra*; *Hollingsworth v. Choates*, 42,424 (La. App. 2 Cir. 8/22/07), 963 So. 2d 1089.

The buyer's action against a realtor for negligent misrepresentation arises ex delicto, under La. C.C. art. 2315. *Bailey v. Delacruz, supra*. In order for a plaintiff to recover based upon negligent misrepresentation, 1) the defendant must possess a legal duty to supply the correct information, 2) there must be a breach of that duty, and 3) the plaintiff must have incurred damages as a result of the breach. *Id.* A real estate agent has a duty to relay accurate information about the property he is selling. The duty extends to both vendor and purchaser. *Id.*

A licensee shall not be liable to a customer for providing false information to the customer if the false information was provided to the licensee by the licensee's client or client's agent and the licensee did not have actual knowledge that the information was false. La. R.S. 9:3894(B)

Where the alleged misrepresentation relates to defects which are apparent and discoverable on simple inspection, and where the buyer inspects the property before the sale, the buyer cannot then complain of fraud or negligent misrepresentation. *Hancock v. Lauzon*, 49,535 (La. App. 2 Cir. 1/14/15), 161 So. 3d 957.

The trial court highlighted, as do we, that this is a case in which the seller is also the agent. Therefore, the agent has the exact same knowledge

23

as the seller. This dual role distinguishes this case from those cited in briefs. We agree with Capt. Sowell and Louisiana Realtors that agents do not have a higher duty than the seller to supply accurate information. That would create a situation in which the agent had to independently verify information before conveying it to the buyer. *See Rabalais v. Gray*, 14-552 (La. App. 5 Cir. 12/16/14), 167 So. 3d 101. In fact, agents owe a *different, not higher*, duty than sellers.

La. R.S. 9:3894(B) relieves an agent of liability for providing false information if he did not have actual knowledge that the information was incorrect. Capt. Sowell, as agent, had a duty to supply correct information. By providing the Disclosure, which stated the water intrusion was remedied in 2016, Capt. Sowell allowed himself, as seller, to supply inaccurate information. Because Capt. Sowell was acting as the seller and the agent, he knew the water intrusion issue was not remedied in 2016. As agent, he had actual knowledge that the home continued to have water intrusions through 2018. Therefore, by supplying the Plaintiffs with the Disclosure, he supplied false information. The first two prongs of the negligent misrepresentation elements have been met, i.e. duty and breach.

The third prong for negligent misrepresentation is that the Plaintiffs incurred damages as a result of the breach of duty. The Plaintiffs incurred damages because they would not have bought the home if they had known of all of the water intrusion events. The purchase of the home led the Plaintiffs to incur damages for repairs after additional water intrusion events.

An agent may be relieved of alleged negligent misrepresentation if the defects are apparent and discoverable upon simple inspection. In this case, there was no evidence of water intrusion because repairs were done after the

24

last event. It would have taken more than a simple inspection to ensure the previous work was sufficient to protect the home against water intrusions. As noted by the trial court, to this day, it is not perfectly clear whether the problem has been resolved.

We affirm the trial court's ruling that Capt. Sowell, as agent, negligently misrepresented the water intrusion issue. In doing so, we emphasize that this is not the placement of a higher burden on the agents. Although it is rare for an agent to be liable and the seller not be liable, this is an outlier case because the agent and seller are the same person; therefore, the agent had actual knowledge of each water intrusion and the remedies performed. By transmitting a Disclosure that he knew was not accurate, Capt. Sowell, as agent, breached his duty to provide correct information to the buyers. This case is unique in its particular set of facts and should not be construed to place a higher burden on real estate agents, except where the real estate agent was the seller/owner of the home and knew of the defects.

## CONCLUSION

For the reasons stated above, we affirm the trial court's ruling. Each party bears its own costs in this appeal.

**AFFIRMED.**